PEOPLES TRUST AND SAVINGS BANK  Boonville,  Indiana, Appellant (Plaintiff Below),

v.

Jerry W. HUMPHREY and Carolyn L. Humphrey,  Appellees (Defendants Below).

No. 1–582A121.

Court of Appeals of Indiana, First District.

July 27, 1983.

**1106**

Charles F. Cremer, Jr., Matthew H. Hobbs, Charles F. Cremer, Jr. & Co., Indianapolis, Mark Hart Hendrickson, Boonville, for appellant.

James E. Fields, Perdue, Brenton & Fields, Evansville, for appellees.

ROBERTSON, Presiding Judge.

The plaintiff-appellant, Peoples Trust and Savings Bank (Bank) appeals a judgment which denied its complaint to foreclose a mortgage given by the defendants-appellees, Jerry W. and Carolyn L. Humphrey (Humphreys), as security for a realty installment loan. The trial court also granted Humphreys' counterclaim for misrepresentation and awarded them $1,000 in compensatory damages and $40,000 in punitive damages. Additionally, the trial court reformed the loan, thus fixing the interest rate at 8½% annually and deleting a demand clause.

The multiple issues which Bank has raised do not present reversible errors.[1]

We affirm.

Humphreys approached the Bank in February, 1978, seeking a construction loan for a house. Construction costs were to be $60,000 and Humphreys were seeking a $35,000 loan. They intended to finance the balance with money from the sale of their former home. Humphreys explained to Bennett, the Bank's vice-president whom they had dealt with previously, that the Bank's president, Waldo Hendrickson, had promised them a good deal on their next loan because of their dissatisfaction with charges for a prior loan. Bennett told them that he would discuss the loan with Hendrickson. On February 28, 1978, the Bank made a verbal commitment for a $35,000 loan at an 8½% annual interest repayable over 20 years.[2] No documents were executed at that time.

Humphreys began construction and expended all their funds. On June 8, 1978, they signed a promissory note with the Bank for the balance of their construction funds, a total of $35,482. This was a 4 month note with an annual interest rate of 8½%, an annual percentage rate of 8¾% based on a 20 year payoff and a finance charge of $1507.99. The note contained a "demand clause". Humphreys also executed a mortgage to secure the note.

According to Humphreys, no discussion took place when this note was executed nor were they informed that the note was payable on demand. A variable interest rate was not mentioned and no disclosure statements, other than the note itself, were given to Humphreys. Humphreys believed that they had a 20 year loan at 8½% interest.

On October 11, 1978, Humphreys executed a renewal note which contained the same terms as the original note except that it was a 90 day note rather than a 4 month note. Neither interest charges nor the demand clause were discussed. Construction was completed prior to expiration of the 90 day period and on November 28, 1978, Humphreys returned to the Bank where they executed a third note which was titled a "Realty Installment Note".

The Realty Installment Note provided for repayment by 240 monthly payments of $308.00 each, which were due on the fifth of each month beginning in January, 1979. The note provided for an interest charge of 8½% annually. The note also contained a variable interest rate clause, which provided that "the rate of interest per annum may be 4% more than the bank pays on any time deposit", and a demand clause. The Humphreys were also given a Truth In Lending disclosure statement to sign which reflected the note's terms except the demand clause.

At trial, Humphreys explained that when they arrived at the Bank to sign the third note, Bennett was busy and instead, they dealt with Mr. Bender. All the documents had been completed except for their signatures. They did not read the documents in their entirety, but they did scan them to verify the number and amount of monthly payments and the amount of the loan. Upon seeing the variable interest provision, Humphreys asked Bender about it and were told that the Bank. had raised rates once before, but probably would not do so again and that they should not worry about it. Humphreys signed the note and disclosure statement. Thereafter, they began making their monthly payments.

In October, 1979, Humphreys received a letter from the Bank notifying them that

1. It is appropriate to observe that the Bank has phrased the issues in its brief in a broad manner and in a style that raises multiple questions which, in some instances, are not supported by cogent argument or citation to appropriate authorities as required by Ind.Rules of Appellate Procedure 8.3(A)(7). We will not address those questions. We have reordered and rephrased some issues.

2. Humphreys' "Credit Information Sheet", a record of their loan activity which the Bank had compiled, was introduced at trial and it also reflected approval of a $35,000 loan at 8½ % interest to fund construction of a $60,000 house, contingent on appraisal.

the interest rate on their loan would be increased to 9½% annually effective December 1, 1980. Jerry Humphrey called the Bank and talked with President Hendrickson. He reminded Hendrickson of the Bank's promises of a better deal. Hendrickson responded that the increase was in keeping with the Bank's policy for years and that the Bank would continue to pursue it. The conversation became heated and Hendrickson called Humphrey's attention to the demand provision in the loan, threatening to foreclose the mortgage if Humphrey made trouble. The next week, Humphreys received a copy of their Realty Installment Loan with the demand provision underlined.

Humphreys made their monthly payments and the controversy languished until February, 1980. Humphreys retained counsel, who wrote the Bank alleging that it had violated Truth In Lending disclosure regulations and state law. The letter sought to fix the interest rate at 8½%. In response, the Bank demanded full payment of the loan. Humphreys' counsel requested negotiations and the Bank again demanded full payment. The Bank instructed its tellers to refuse any tendered payments except full payment. Humphreys then tendered their March 5, 1980, payment; the Bank kept their check and again wrote them saying that anything less than full payment would be unacceptable. Humphreys' counsel responded that his clients would not be threatened into making full payment. Humphreys tendered the April 5, 1980, payment and the Bank again retained the check without crediting their account. On April 11, 1980, the Bank filed its foreclosure action.

■ For its first issue, the Bank argues Humphreys were incorrectly granted a change of venue because their motion for a change was untimely. Ind.Rules of Procedure, Trial Rule 76(2) provides that an application for a change of venue shall not be filed later than 10 days after the issues are first closed on the merits. Because of their attempt to remove the litigation to federal court, Humphreys' motion was filed more than 10 days after their answer.

The relevant facts show that the Bank's foreclosure complaint was filed April 11, 1980. Humphreys filed their answer and a counterclaim on May 1, 1980. They also filed a petition to remove the case to federal court predicated on Truth In Lending violations asserted in their counterclaim. On May 28, 1980, the federal court remanded the case to state court because it had erroneously granted removal. On May 30, 1980, Humphreys moved for a change of venue from the county. The Bank filed objections, which were denied.

Thus, the issue is whether the 10 day time limit in T.R. 76(2) is tolled during removal of an action to federal court when the action is subsequently remanded to state court. We find that the time is tolled and therefore, also find that Humphreys' motion was timely because it was filed within 10 days after remand.

■ With certain exceptions not applicable to this appeal, the general rule is that removal of a case to federal court divests the state court of jurisdiction. 38 A.L.R. Fed. 824. This principle has been recognized in Indiana, *Fossey v. State,* (1970) 254 Ind. 173, 258 N.E.2d 616. Additionally, during the pendency of the removal petition, any proceedings by the state trial court are void until remand by the federal court. *Fossey, supra.* We believe that a better reasoned statement about the impact of removal, as it relates to a state court's jurisdiction during the period of removal, is expressed in the case of *Doerr v. Warner,* (1956) 247 Minn. 98, 76 N.W.2d 505, cert. dismd. 352 U.S. 801, 77 S.Ct. 20, 1 L.Ed.2d 37.

An order remanding an action to the Federal court does not absolutely divest the state court of its jurisdiction but merely suspends or holds that jurisdiction in abeyance either until the action is terminated in the Federal court or until the latter court remands the action to the state court; and in the event of a remand, the state court's continuous, though dormant, jurisdiction is revived and such court then proceeds to a final determination of the action in the exer-

cise of its continuing original jurisdiction which was acquired when the action was originally commenced. It is well settled that jurisdiction once acquired by a state court is continuous though the case has been removed to the United States District Court and later remanded to the state court. The basic correctness of this rule becomes at once apparent if it is borne in mind that the order removing an action to a Federal court does not terminate the state court's jurisdiction *but merely stays or interrupts proceedings in that court* pending a disposal of the action by the Federal court. The effect of an order remanding is not to invest the state court with a new jurisdiction but merely to revive a jurisdiction previously acquired but held in abeyance. These principles are so thoroughly settled that a lengthy discussion of them is unnecessary. (original emphasis, footnote deleted).

76 N.W.2d at 512.

We think this is the logical approach. Otherwise when a removal petition is filed, the moving party is subjected to a game of chance with the outcome dependent on the federal court's decision on the removal petition. In contrast, tolling the time period eliminates uncertainty, preserves the status quo, and is easily applied. Therefore, the change of venue was not erroneous.

Next, the Bank argues the trial court erred by denying its motion for judgment on the pleadings. The Bank's motion was predicated on the assertion that Humphreys' counterclaim alleged a federal Truth In Lending violation which was barred by the one year statute of limitations in 15 U.S.C.A. § 1640(e). The Bank also relies on *Noel v. General Finance Corporation,* (1981) Ind.App., 421 N.E.2d 25, for the proposition that a debtor-counterclaimant may not have an affirmative recovery for a Truth In Lending violation beyond the one year limit. Because Humphreys' counterclaim alleges the Bank failed to make appropriate disclosures on June 8, 1978, October 11, 1978, and November 28, 1978, and because it was not filed until May 1, 1980, the Bank contends the pleadings reveal that the statute of limitations had expired.

■ Both parties assert the correct standard for evaluating a motion for judgment on the pleadings. In essence, the moving party admits, for purposes of the motion, all facts pleaded in the opponent's claim and all reasonable inferences are drawn in the nonmovant's favor. *Claise v. Bernardi,* (1980) Ind.App., 413 N.E.2d 609.

■ The Bank's argument in support of its motion, both at trial and on appeal, also sets the tone for the balance of its case. The Bank asserts that the counterclaim alleged *only* a Truth In Lending claim.[3]

Although 15 U.S.C.A. § 1640(e) does place a one year statute of limitations on affirmative recoveries under the act, the

---

**3.** It is appropriate at this point to explain the relationship this argument has to the remaining issues before us. In its fourth issue, the Bank argues fraud, misrepresentation and unconscionability were not properly pleaded, thus claiming only a Truth In Lending violation was at issue. In issue five, the Bank challenges the trial court's negative decision on its foreclosure claim, arguing that Humphreys proved only a Truth In Lending violation which does not affect the contract. In issues six, seven, and eight, the Bank contends the trial court made clearly erroneous findings of fact and conclusions of law on the issues of fraud, misrepresentation, and unconscionability, and also erred by viewing the three notes as a continuous transaction. Underlying these issues are the arguments that Humphreys pled only a Truth In Lending violation and that a Truth In Lending violation does not affect the contract. This

line of reasoning is carried over to issue ten, which challenges the punitive damages award, and issue eleven, which challenges the trial court's reformation of the contract. The Bank asserts Humphreys are limited to statutory damages authorized by the Truth In Lending Act.

In summary, throughout its appeal, the Bank argues Humphreys only pleaded a Truth In Lending violation. As a corollary, the Bank continuously argues a Truth In Lending violation has no impact on the underlying contract and therefore, argues that Humphreys were limited to a Truth In Lending remedy. In our discussion of the Bank's motion for judgment on the pleadings, we will resolve both the issues of pleading and of the potential actions available to the Humphreys. By doing so, we are also resolving the Bank's remaining issues as outlined *infra.*

trial court did not err by denying judgment on the pleadings. Contrary to the Bank's view, Humphreys' counterclaim was not solely based upon a Truth In Lending violation. Simply because Humphreys asserted that a federal question was present in their removal petition does not mean that it was the only theory in their counterclaim. Drawing inferences in their favor, the counterclaim also presented a claim for misrepresentation or fraud.

Ind.Rules of Procedure, Trial Rule 8(A) states that a counterclaim must contain:

(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for the relief to which he deems himself entitled.

Relief in the alternative or of several different types may be demanded.

Accurately described as "notice pleading", this rule requires only that the complaint state the operative facts involved in the cause of action. . . . The complaint need not state the legal theory upon which recovery is sought, nor even all of the elements of the cause of action. (Citations omitted.)

*F.W. Means & Co. v. Carstens,* (1981) Ind. App., 428 N.E.2d 251, 262.

Humphreys' counterclaim stated the facts as described *infra.* and requested damages and reformation of the note; it adequately states the operative facts involved and the relief sought.

■ Likewise, the Bank's arguments that Humphreys failed to specifically plead fraud pursuant to Ind.Rules of Procedure, Trial Rule 9(B), or to raise fraud and unconscionability as affirmative defenses pursuant to T.R. 8(C), fail. The Bank seems to think the words "fraud" or "misrepresentation" are essential to an adequate claim.

Dean Harvey has properly outlined T.R. 9(B)'s requirements stating:

The circumstances constituting fraud or mistake must be stated with particularity. In general the circumstances of fraud would be the time, the place, the substance of the false representations,

the facts misrepresented, and the identification of what was procured by the fraud. . . . Rule 9(B) must be read with Rule 8 requiring short and concise statements of claim.

1 W. Harvey, Indiana Practice § 9.2 at 542 (1969).

The facts alleged by Humphreys satisfy this criteria.

T.R. 8(C), concerning affirmative defenses, does specify fraud is an alternative defense, however, the rule goes on to state that:

If the pleading mistakenly designates a defense as a counterclaim or a counterclaim as a defense, the court shall treat the pleading as if there had been a proper designation.

Humphreys raised fraud in their counterclaim and pursuant to T.R. 8(C) that was adequate.

■ We now turn to the Bank's related arguments that Truth In Lending violations do not affect the underlying contract and that the Truth In Lending Act provides the Humphreys' exclusive remedy.

The Truth In Lending Act at 15 U.S.C.A. § 1610 discusses its effect on state laws.

Subsection (d) states:

Contract or other obligations under State or Federal law

(d) Except as specified in sections 1635, 1640, and 1666e of this title, this subchapter and the regulations issued thereunder *do not affect the validity or enforceability of any contract or obligation under State or Federal law.* (Emphasis added.)

The Bank interprets this subsection to mean that an institution's failure to disclose terms pursuant to the act cannot affect the enforceability of the underlying contract. Thus, the Bank reads 15 U.S.C.A. § 1640, which provides civil penalties for violations of the act, as providing exclusive remedies to debtors.[4]

The Bank's interpretation is erroneous and neglects the emphasized language in

---

**4.** § 1635 and § 1666(a) are not relevant.

subsection (d). The validity or enforceability of credit contracts is still to be determined by applicable state and federal law. The subsection merely provides that a disclosure violation does not void a contract; it does not limit the application of state law. *Piatchek v. Fairview Reliable Loan, Inc.,* (S.D.Ill.1979) 474 F.Supp. 622; *Hobbiest Financing Corporation v. Spivey,* (1975) 135 Ga.App. 353, 217 S.E.2d 613.

In the following cases, the courts held a debtor has alternative remedies under state law and § 1640. These cases also support the conclusion that state law determines the validity of a contract although the facts reveal Truth In Lending violations. *Ninth Liberty Loan Corp. v. Hardy,* (1977) 53 Ill. App.3d 601, 11 Ill.Dec. 363, 368 N.E.2d 971; *Public Finance Corp. v. Riddle,* (1980) 83 Ill.App.3d 417, 38 Ill.Dec. 712, 403 N.E.2d 1316; *Ballew v. Associates Financial Ser. Co. of Neb., Inc.* (D.Neb.1976), 450 F.Supp. 253; *Cantrell v. First National Bank of Euless,* (1978) Tex.App., 560 S.W.2d 721.

In summary, to the extent that the Bank's appeal is based upon the arguments that Humphreys pled only a Truth In Lending claim, that the Truth In Lending Act is an exclusive remedy and that the act precludes the application of Indiana law to determine the contract's validity, the appeal fails. *See,* N. 4 *infra.*

At this point, we are left with essentially three issues: 1) whether the trial court erred by allowing Humphreys to amend their counterclaim; 2) whether the court erred by examining parol evidence and treating the three notes as a continuous transaction; and 3) whether the evidence is sufficient to support the trial court's findings and relief.

The Bank argues the trial court abused its discretion by allowing Humphreys to amend their counterclaim less than three weeks prior to trial.

The nature of the amendment was to increase the counterclaim for damages by the amount of attorney fees which the Bank sought from the Humphreys "in its foreclosure suit and to include punitive damages. The background of events lead-

ing up to the amendment shows that the Bank filed suit on April 11, 1980, and on or about June 4, 1980, added attorney fees in the amount of $1100 to Humphreys' account. On December 6, 1980, at a pre-trial hearing, Humphreys' counsel made an oral motion to add a count of damages in the sum of $1100 to their counterclaim in response to the Bank's addition of that amount to its foreclosure claim. The trial court replied that the motion would be granted when it was filed in writing. The motion was filed and granted on April 7, 1981, with the trial scheduled to begin on May 5, 1981.

■ Ind.Rules of Procedure, Trial Rule 15(A) permits the amendment of pleadings by leave of court. The amendment of pleadings is reviewable for an abuse of discretion. *Dehart v. Anderson,* (1978) 178 Ind.App. 581, 383 N.E.2d 431. Pleading amendments are to be freely allowed so the court may try all issues. *State Farm Mutual Auto Ins. Co. v. Shuman,* (1977) 175 Ind. App. 186, 370 N.E.2d 941. Prejudice must be shown to justify a denial of leave to amend pleadings. *Selvia v. Reitmeyer,* (1973) 156 Ind.App. 203, 295 N.E.2d 869.

■ We are not as quick as the Bank to see the prejudice and delay that it claims resulted from the April 7th amendment. The record discloses that the Bank had actual knowledge of the substance of the amendment and the ruling on it for about five months prior to trial. The amendment was of a workaday nature. There is no showing that additional time to research legal issues or proceed with discovery was necessary. The delay in filing the amendment was perhaps inconsiderate, but certainly it falls short of a demonstrable abuse of discretion by the trial judge.

■ The Bank claims the trial court erred by construing the three notes as a continuous transaction and by examining parol or extrinsic evidence, including the Truth In Lending disclosure statement of November 28, 1978, to determine the parties' intent. In part, this argument is based on issues which have been resolved against

the Bank. We have determined fraud and misrepresentation were properly at issue. Parol evidence is admissible when fraud is at issue. *Floyd v. Jay County Rural Electric Membership Corp.,* (1980) Ind.App., 405 N.E.2d 630; *House v. Lesow,* (1975) 167 Ind.App. 449, 339 N.E.2d 86; *Weaver v. American Oil Company,* (1971) 257 Ind. 458, 276 N.E.2d 144. Additionally, although a Truth In Lending statement is not part of the underlying contract, we fail to see why it should not be admissible as extrinsic evidence to shed light on the parties' perception of the transaction. We will address the continuous transaction issue next when we review the trial court's findings.

The Bank raises numerous issues challenging the trial court's findings of fact and conclusions of law. Essentially, the Bank is attacking the evidentiary basis for the trial court's findings, particularly its findings concerning intentional misrepresentation and unconscionability, and the resulting relief granted.

■ We first note that we may not reverse a trial court's decision and its related findings unless they are clearly erroneous, *Indiana Industries, Inc. v. Wedge Products,* (1982) Ind.App., 430 N.E.2d 419; Ind.Rules of Procedure Trial Rule 52(A). Furthermore, we may not reweigh the evidence or judge the witnesses' credibility. *Id.* It is also important to recall the elements of misrepresentation.

> To sustain an action for fraud it must be proven that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and that another party did in fact rely on the representation and was induced thereby to act to his detriment.

*Fleetwood v. Mirich,* (1980) Ind.App., 404 N.E.2d 38, 42.

■ Additionally, and particularly relevant to this case, when parties to a contract have a prior understanding about the contract's terms, and the party responsible for drafting the contract includes contrary terms and then allows the other party to sign it without informing him of changes,

the drafter's conduct is fraudulent. *McNair v. Public Sav. Ins. Co. of America,* (1928) 88 Ind.App. 386, 163 N.E. 290.

In *McNair,* the court discussed the party's duty to disclose stating:

> *Concealment becomes fraudulent only when it is the duty of the party having knowledge of the facts to discover them to the other; and this brings back the question, When does such duty rest upon either party to any transaction: All the instances in which the duty exists, and in which a concealment is therefore fraudulent, may be reduced to three distinct classes.* These three classes are, in general clearly distinct and separate, although their boundaries may sometimes overlap, or a case may fall within two of them. . . . 2. *The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances.* The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances. (Emphasis added, Citations Omitted).

163 N.E. at 293.

■ With these concepts in mind, we cannot find the trial court's findings clearly erroneous. Humphreys approached the Bank seeking a construction loan which was to be secured by a mortgage. The Bank represented that the loan would be at 8½% annually and would be repayable over 20 years.˄ Ultimately, the actual loan agreement provided for variable interest and payment on demand, provisions which were

contrary to the parties' original understanding of the contract.

The Bank makes a great deal of the facts that Humphreys had prior loans with it, that the demand provision was contained in all three notes, that three separate loan agreements were executed and that Humphreys read the variable interest provision in the third note, the Realty Installment Note. The Bank argues Humphreys' prior transactions put them on notice about the variable interest provision because a prior loan contained a variable interest clause. It claims Humphreys were not obligated to ultimately finance the long term note with it, and it asserts the notes were separate transactions.

We disagree. The Bank disregards its construction loan policy and statements made by the employees. Bennett explained the Bank's policy for construction loans. Short term demand notes were executed to cover the construction period and thus provide the Bank with additional security. The Bank would distribute the loan proceeds on a monthly basis to cover construction costs by either paying bills directly or depositing an appropriate amount in the borrower's account. Also during construction, the Bank supervised the work and made periodic appraisals to insure its security interest was adequate. Bennett further explained that if the property was not sold upon completion, the debt would be converted to a long term installment note.

■ This procedure was followed in Humphreys' case. In fact, Bennett explained the second note, the 90 day note, was executed because construction wasn't completed on schedule. Once construction was completed, the debt was converted to the long term installment note. Therefore, the Bank itself viewed the three notes as a

continuous transaction which would culminate in a long term loan. Indeed, the Bank actively participated in the progression of events. Humphreys' potential awareness of the demand clause in the first two notes would not have put them on notice that the final note would be a demand-installment note because of the Bank's own procedures.[5] The fact that Humphreys had a prior loan with a variable interest clause does not undermine their claim. Humphreys were specifically promised a "better deal" than their last prior loan. The Bank's contention that Humphreys were not obligated to long term financing with it views events from an erroneous perspective. Instead, the proper focal point is Humphreys' perspective that if they had a long term loan with the Bank, it would be according to their previously negotiated understanding. Reaching that stage was merely a matter of renewing the interim notes as a permanent installment note, *according to the Bank's normal procedures for construction loans.*

Likewise, the fact that Humphreys read the variable interest provision in the Realty Installment Note does not defeat their claim. They questioned Bender, in Bennett's absence, about the variable interest provision and were told not to worry about it. Taken in context, they were justified in assuming the variable interest provision was not applicable.

Drawing inferences favorable to the judgment, the Bank represented one set of contract terms to Humphreys; then it drafted other more odious terms; it allowed Humphreys to execute notes and a mortgage based upon their original understanding, but containing the latter terms; and then the Bank attempted to apply the unfair terms, particularly the demand

---

**5.** Even if misrepresentation was not at issue, the third note could still be properly characterized as an installment note. Although it contains a demand clause, it is boldly titled a Realty Installment Note and it provides for monthly payments over a period of 20 years. Therefore, the case at bar is distinguishable from *Creech v. LaPorte,* (1981) Ind.App., 419 N.E.2d 1008, where we upheld a demand clause

because the note in question provided no other specific time for payment. A note which is payable on demand, but which also provides for monthly installment payments, can properly be construed as an installment note. *Corbin Deposit Bank and Trust Co. v. Mullins Enterprises, Inc.,* (1982) Ky.App., 641 S.W.2d 760; 11 Am.Jur.2d *Bills and Notes* § 168.

clause. The trial court's findings are not clearly erroneous.[6]

■ The Bank challenges the sufficiency of the evidence to support the trial court's award of $1,000 in actual damages to Humphreys. This issue is related to the Bank's argument about punitive damages because it asserts without actual damages, punitive damages are improper.

The facts reveal the Bank held two of Humphreys' payments totaling $608.00 for over a year without crediting their account or returning their checks. Additionally, the Bank clouded Humphreys' title by its foreclosure action when their monthly payments were current. This evidence is sufficient to support the award of actual damages. *Shelby Federal Sav. and Loan Ass'n v. Doss,* (1983) Ind.App., 431 N.E.2d 493. To the extent this issue is related to punitive damages, the punitive damages are also appropriate.

Two issues remain concerning punitive damages: 1) is it proper for the Bank to be subjected to punitive damages when it is also potentially subject to criminal penalties under the Truth In Lending Act? and 2) does the evidence supporting punitive damages satisfy the "clear and convincing" standard of proof required by our supreme court in *Travelers Indem. Co. v. Armstrong,* (1982) Ind., 442 N.E.2d 349?

■ Corporations are specifically excluded from the prohibition against punitive damages coupled with criminal sanctions. *Nicholson's Mobile Home Sales, Inc. v. Schramm,* (1975) 164 Ind.App. 598, 330 N.E.2d 785.

The supreme court in *Travelers* was concerned with the assessment of punitive damages in cases of good faith contract disputes. The court determined "clear and convincing" evidence is necessary to support punitive damages in a contract dispute. Explaining this standard, the court stated:

> [P]unitive damages should not be allowable upon evidence that is merely consist-

ent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is *inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.* (Emphasis added.)

442 N.E.2d at 362.

■ In the case at bar, evidence inconsistent with the hypothesis of human failing is present. As we have recounted, the Bank represented one set of terms to Humphreys, but included others in the notes. Humphreys were left in the position of having expended their loan receipts and having their newly completed home subject to foreclosure on demand even though their monthly payments were current. Even more damning, the Bank invoked the demand clause only after Humphreys questioned their contract. Humphreys introduced evidence that the Bank had threatened another borrower in a similar situation with foreclosure if he sought legal advice. We find this scenerio inconsistent with "noniniquitous human failing", *Travelers, supra.* Punitive damages were appropriate.

The Bank argues reformation was erroneous, relying on its previously raised argument that misrepresentation and unconscionability were not at issue, but conceding reformation is appropriate when unconscionability and misrepresentation are involved. Consistent with the award of punitive damages, unconscionability and misrepresentation were at issue and reformation was appropriate.

The trial court's judgment is affirmed.

HOFFMAN, P.J., sitting by designation, and NEAL, J., concur.

---

**6.** The trial court did conclude that a variable interest rate and a demand clause were unconscionable in any context whether disclosed or not. We limit our review to the facts of this case and the trial court's findings which go beyond these facts are surplusage.