**LAFAYETTE REALTY CORPORATION, Plaintiff-Appellant,**

v.

**VONNEGUT'S, INC., Vonnegut Hardware Co., Inc., and Schlage Lock Co., Defendants-Appellees.**

No. 1-383A95.

Court of Appeals of Indiana, First District.

Jan. 19, 1984.

Paul G. Roland, Walter F. Lockhart, Ruckelshaus, Roland & O'Connor, Indianapolis, for plaintiff-appellant.

1. Schlage, pursuant to an Assumption of Lease and Guaranty executed in January of 1965, became a guarantor of rental payments in the event Vonnegut's defaulted on its lease with Lafayette. Schlage has never occupied the premises.

Joseph B. Carney, Mary K. Lisher, Baker & Daniels, Indianapolis, for Schlage Lock Co.

John J. Kish, Indianapolis, for Vonnegut's, Inc.

RATLIFF, Judge.

## STATEMENT OF THE CASE

In an action tried to the Hancock Circuit Court judgment was rendered for the defendants, Vonnegut's, Inc., Vonnegut Hardware Co., Inc., (Vonnegut's) and Schlage Lock Co., upon Lafayette Realty Corporation's complaint for damages arising from the defendants' default on a lease and guarantor contract.[1] Lafayette appeals.

We affirm.

## FACTS

In October of 1959 Lafayette and Vonnegut's executed a lease in which the latter agreed to lease from the former a storeroom in an Indianapolis shopping center for the purpose of conducting a retail hardware business.[2] The lease provided, *inter alia*, that "[Vonnegut's] shall keep the ... heating plant ... in a good state of repair, but [Vonnegut's] shall not be required to replace the heating plant ... or to make any replacements of any parts thereof which are of such a nature as to constitute capital replacements." Record at 446. Instead, the lease continued: "[Lafayette] agrees to make any capital replacements of or to the heating plant ... which may become necessary during the term of this lease." *Id.* In the event Lafayette failed to adhere to the above-stated terms of the lease, the parties provided the following alternative:

"(d) [Lafayette] hereby agrees that, in the event of [Lafayette's] default in performance of any undertaking or condition that by the terms of this lease is to

2. The lease commenced on January 1, 1960, and was to expire on December 31, 1980. Under its terms Vonnegut's agreed to pay $21,840 per year in rent as well as its pro rata share of the maintenance and lighting expenses for the shopping center parking lot. These charges were not to exceed $560 per year.

be performed by [Lafayette], [Vonnegut's] shall be entitled, *at its option,* after having given [Lafayette] thirty (30) days' written notice of such default, to perform the undertaking or condition as to which [Lafayette] is in default. [Vonnegut's] shall be entitled to deduct the full cost of such performance from rental payments becoming due after the date of [Vonnegut's] so performing."

*Id.* (emphasis supplied). However, the lease made the following reservation:

"(e) [Lafayette] and [Vonnegut's] agree that the remedies specified in subparagraphs (c) and (d), above, are available at the option of [Lafayette] and [Vonnegut's], respectively. Such specification of such optional remedies shall not be deemed to preclude either [Lafayette] or [Vonnegut's] from invoking any other remedy available to them by law."

*Id.*

During a routine service inspection of the store's heating plant on October 19, 1972, the heat exchanger was found to have deteriorated to the extent holes were visible and carbon monoxide fumes leaked into the store when the system was operated. Because of this danger Vonnegut's was advised to refrain from operating the system until the heat exchanger was replaced.[3] Vonnegut's advised Lafayette of the problem immediately.

In response, a Lafayette maintenance employee and an employee of Thiele Heating and Air Conditioning, Inc., were sent by Lafayette to the store to inspect the heating plant. Following their inspection, they advised Lafayette that the entire heating plant should be replaced.

After several unanswered telephone calls to Lafayette's president, Vonnegut's general manager finally contacted Thomas Voigt, Lafayette's vice-president. Voigt expressed he had little knowledge of the problem, but proposed an arrangement wherein Lafayette would pay half of the cost of replacing the system if Vonnegut's agreed to pay the balance. Vonnegut's general manager rejected the offer verbally and confirmed the rejection in a letter dated October 31.[4] Subsequent to this letter there were no further communications between the parties until Vonnegut's notified Lafayette it had vacated the premises.

With the heating plant inoperative, Vonnegut's store became increasingly uncomfortable and ill-suited for conducting business.[5] Despite attempts to heat the store with portable heaters, employees found it necessary to wear coats, hats, and gloves while at work. Even with these efforts the store was closed early on several occasions because of the cold conditions. Finally, on November 24, Vonnegut's vacated the premises and surrendered possession to Lafayette.[6]

After installing new heating units in the store on December 1, Lafayette contacted Vonnegut's for the first time since October and advised Vonnegut's that it would be expected to comply with the terms of the lease. Vonnegut's, however, refused to move its operations back to the Lafayette property thereby prompting Lafayette's action for breach of the lease.

In its defense, Vonnegut's contended the lack of heat and Lafayette's refusal to make the needed repairs within a reasonable time constituted a constructive eviction. The trial court agreed and rendered judgment for Vonnegut's.

## ISSUES

Restated, the issues presented by Lafayette are:

1. Whether there was sufficient evidence to support the trial court's finding

---

**3.** All parties agreed the heat exchanger component was not susceptible to being repaired.

**4.** In this letter Vonnegut's reiterated its position that the lease required Lafayette to absorb the entire cost since replacement of the heat exchanger constituted a capital replacement.

**5.** Testimony revealed the average daily temperature in the store from October 19 to November 15 was between 30 and 40 degrees.

**6.** Vonnegut's notified Lafayette of its actions in letter of the same date.

that Vonnegut's was constructively evicted?

2. Whether Lafayette was afforded a reasonable time within which to replace the heating plant before Vonnegut's quit the premises?

3. Whether Vonnegut's previous conduct in making necessary capital replacements made its refusal to replace the defective heating plant a breach of the terms of the lease?

### DISCUSSION AND DECISION

■ At the outset we find it necessary to discuss the applicable standard of review. While the parties state in their briefs that Lafayette is appealing from a negative judgment and must therefore show it to be contrary to law, they are wrong. By granting judgment to Vonnegut's on grounds it was constructively evicted the trial court did not, *ipso facto*, find Lafayette had failed to sustain its burden of proof. Instead, it simply found Vonnegut's had sustained its burden of proof as to the affirmative defense of constructive eviction. Consequently, Lafayette is not appealing from a negative judgment. *See Ross v. Ross*, (1979) Ind.App., 397 N.E.2d 1066, 1068; *State v. Boyle*, (1976) 168 Ind. App. 643, 645, 344 N.E.2d 302, 304, *trans. denied*.

■ In the instant case, Lafayette appeals from a judgment rendered by a court trial. Thus, it will not be disturbed unless we find it to be clearly erroneous. *Peoples Trust & Savings Bank v. Humphrey*, (1983) Ind.App., 451 N.E.2d 1104, 1112; *Litzelswope v. Mitchell*, (1983) Ind.App., 451 N.E.2d 366, 369; Indiana Rules of Procedure, Trial Rule 52(A). Such a finding will be made only if there are no facts or inferences to be drawn therefrom which are supportive of the judgment. *Kimbrell v. City of Lafayette*, (1983) Ind.App., 454 N.E.2d 73, 74. Moreover, we will neither reweigh the evidence nor judge the credibility of witnesses, but instead, will give due regard to the trial court's ability to perform this function. *Litzelswope*, 451 N.E.2d at 369.

The applicable standard of review thus stated, we turn to the substantive issues.

*Issue One*

Lafayette first argues there was insufficient evidence to support the trial court's finding of constructive eviction. More specifically, Lafayette asserts that the defect in the heating plant was neither substantial or permanent in character, nor shown to be of such a nature as to require Lafayette to make a capital replacement as contemplated in the lease. This contention is without merit.

■ Constructive eviction has been defined as a dispossession by a lessor who, without intending to oust the lessee, commits an act which serves to deprive the latter of the beneficial use of some part of the premises. *Talbott v. English*, (1901) 156 Ind. 299, 307, 59 N.E. 857, 860. This act or breach by the lessor, however, must be "so substantial and permanent in character" as to effectively exclude the lessee from a beneficial use of the property. *Id.*, 156 Ind. at 305–06, 59 N.E. at 860.

■ In the instant case there is abundant evidence to support the trial court's conclusion that Lafayette's breach was "substantial and permanent in character" and served to effectively exclude Vonnegut's from any beneficial use of the store. Upon discovering the defect on October 19, Vonnegut's notified Lafayette immediately. The next day, following an inspection by Lafayette's own maintenance employee and a private contractor hired by Lafayette, the suspected nature of the defect was confirmed and Lafayette was advised that the heating plant needed replacement. Despite this knowledge and the terms of the lease which required Lafayette to make all capital replacements, it proposed that Vonnegut's pay half of the cost. Vonnegut's relying upon the terms of the lease, rejected this proposal and heard nothing further from Lafayette. Meanwhile, temperatures in the store were at or near the freezing mark and Vonnegut's found it nearly impossible to conduct its retail business. Fi-

nally, on November 24, after enduring these conditions for over a month, with no assurances from Lafayette that the replacement would be made, Vonnegut's vacated the premises and notified Lafayette it was surrendering possession of the property.

Faced with these facts we cannot say the trial court's judgment that Lafayette's conduct resulted in a constructive eviction was clearly erroneous. Nor do we believe there was insufficient evidence that the nature of the defect in the heating plant required a capital replacement to be made. To the contrary, evidence was presented to the trial court that the heat exchanger was a major component of the heating plant, indeed, the "heart of the whole system." Record at 531. Thus, the trial court was justified in determining that a capital replacement was necessary and that it was Lafayette's responsibility to make it. Accordingly, we find no error here.

*Issues Two and Three*

In a final attack on the trial court's judgment, Lafayette, in essence, argues that because Vonnegut's accepted responsibility for making capital replacements on previous occasions,[7] its failure to replace the heating plant in this instance constituted a breach of the terms of the lease. To reach this conclusion Lafayette reasons as follows: Because the lease gave Vonnegut's the option to make capital replacements which Lafayette refused to make, but failed to provide for the present scenario in which Vonnegut's chose not to exercise its option, an ambiguity exists in the lease. Thus, since the lease was drafted by Vonnegut's this alleged ambiguity should have been construed against it and in favor of Lafayette. Had the trial court construed the lease in this manner, Lafayette contends, it would have concluded Vonnegut's was required to give 30 days written notice by certified mail if it chose not to make the capital replacement, and then afford Lafayette a reasonable time within which to

make the replacement. Lafayette's interpretation of the lease is absurd.

■ Examination of the lease reveals the intention of the parties was abundantly clear. In the event Lafayette failed to perform any of its obligations under the lease—such as making capital replacements—Vonnegut's, *at its option,* could perform the task and deduct the cost from its rental payments. Nowhere does the lease require Vonnegut's to notify Lafayette if it chose not to exercise the option. The fact that Vonnegut's may have exercised its option on previous occasions in no way obligated it to do so in the instant case; the duty to make capital replacements remained that of Lafayette. Moreover, the lease expressly reserved to the parties all other remedies at law, remedies such as the defense of constructive eviction. Because the language of the lease is plain we fail to see how it can be construed to impose a duty on Vonnegut's such as the one suggested by Lafayette.

■ Even assuming, *arguendo,* that Lafayette was entitled to such notice and a second chance to make the necessary capital replacement, under the circumstances, we believe it was given a reasonable time within which to do so.

■ To successfully assert the defense of constructive eviction a lessee must quit the premises, *Talbott,* 156 Ind. at 307, 59 N.E. at 360, and do so within a reasonable time. *Sigsbee v. Swathwood,* (1981) Ind. App., 419 N.E.2d 789, 794; *Indiana State Highway Commission v. Pappas,* (1976) 169 Ind.App. 611, 620, 349 N.E.2d 808, 814, *trans. denied* (1977); *General Industrial & Manufacturing Co. v. American Garment Co.,* (1920) 76 Ind.App. 629, 632, 128 N.E. 454, 455, *trans. denied* (1921). In *Sigsbee* we held that the determination of what constituted a reasonable time, a factual question, could only be made upon a consideration of the surrounding circumstances. *Id.,* 419 N.E.2d at 794.

7. The record reveals that Vonnegut's had in fact exercised its option and arranged for major repairs to the store's air conditioning system. However, pursuant to the terms of the lease, Vonnegut's deducted the cost of the repairs from its rent.

Herein, Lafayette received notice of the heating plant defect on October 19 and Vonnegut's quit the premises on November 24. In the interim, Lafayette refused to honor the terms of the lease by making the necessary capital replacement and left Vonnegut's to conduct its retail hardware business in an unheated building where the temperatures hovered near the freezing mark. After a month of these conditions Vonnegut's moved its operations elsewhere and notified Lafayette that it considered itself constructively evicted. Under the circumstances we cannot say Vonnegut's failed to provide Lafayette with a reasonable time within which to make the needed repairs, or that the trial court was clearly erroneous in determining Vonnegut's was constructively evicted.

Finding no error in the trial court's judgment, we affirm.

Affirmed.

NEAL, P.J., and ROBERTSON, J., concur.