INCOME REALTY & MORTGAGE, INC., a Colorado corporation; Richard M. Stern, and Dorothy A. Stern; Santa Fe National Bank, a National Banking Association, as Trustee; and David Engel, Plaintiffs-Appellees,

v.

COLUMBIA SAVINGS AND LOAN ASSOCIATION, a Colorado corporation; and F.J. Serafini, as Public Trustee for the City and County of Denver, State of Colorado, Defendants-Appellants.

No. 81SC134.

Supreme Court of Colorado, En Banc.

March 28, 1983.

Rehearing Denied April 18, 1983.

Sterling & Simon, P.C., Harry Sterling, Nancy D. Miller, Denver, for Income Realty & Mortgage, Inc.

Robert Vinton, Denver, for Stern and Santa Fe Nat. Bank.

Davies and Company, P.C., Joseph A. Davies, Curtis W. Shortridge, Denver, for David Engel.

Wegher & Fulton, P.C., Richard W. Breithaupt, David R. DeMuro, Denver, for Columbia Sav. and Loan Ass'n.

Calkins, Kramer, Grimshaw & Harring, James S. Bailey, Jr., Victor L. Wallace, II, Thomas T. Tornow, Denver, for amicus curiae Sav. & Loan League of Colorado, Inc.

Fairfield & Woods, Patrick F. Kenney, Denver, for amicus curiae Midland Federal Sav. and Loan Ass'n.

Frascona, McClow & Joiner, John H. McClow, James C. Smittkamp, Boulder, for amicus curiae Empire Sav., Bldg. and Loan Ass'n.

Holme Roberts & Owen, James T. Flynn, Lawrence Ponoroff, Colorado Springs, for amicus curiae Federal Home Loan Mortg. Corp.

ROVIRA, Justice.

This case is before us on a writ of certiorari granted pursuant to C.A.R. 50. The district court enjoined the foreclosure of a deed of trust encumbering an apartment building, holding that the "due-on-sale"

clause[1] in the deed of trust constituted an unreasonable restraint on alienation. Respondent Columbia Savings and Loan Association (Columbia) appealed this ruling to the Colorado Court of Appeals. Before the appeal was heard, we granted petitioners' request for a writ of certiorari. We reverse.

### I.

In November 1972, Donald J. Huttner executed a deed of trust encumbering an apartment building. The deed of trust was to secure the payment of a $350,000 promissory note payable to Columbia, bearing an interest rate of 8¾ percent.

Two years later, Huttner conveyed the subject property to United Real Estate, Inc., which in turn conveyed it to Richard and Dorothy Stern the same day. The Sterns and Columbia entered into an agreement under which Columbia agreed not to exercise its rights under the due-on-sale clause in return for the Sterns' agreement to be bound by all of the terms and conditions of the original note and deed of trust and to pay 9¼ percent per annum interest on the unpaid balance.

In 1976, the Sterns conveyed the subject property by special warranty deed to the Santa Fe National Bank as trustee, with the Sterns the beneficiaries of that trust. In 1977, the Santa Fe National Bank entered into an installment land contract with Joseph and Patricia Richards for a purchase price of $435,000.

A year later, the Richards sold the apartment building pursuant to an installment land contract to Income Realty and Mortgage, Inc. (Income Realty), for $550,000. Immediately thereafter, Income Realty entered into an installment land contract with David J. Engel and sold him the property for $640,000. Columbia was not informed of any of the transfers that took place under the installment land contracts.

None of the installment sale purchasers assumed the loan. When Columbia learned of the transactions, it attempted to get David Engel to assume the loan, but he refused. All payments under the note and deed of trust had been made on time.

In January 1979, Columbia filed a notice of election and demand for sale with the Public Trustee pursuant to the due-on-sale clause. Subsequently, the petitioners brought this action for a declaration of the rights of the parties under the due-on-sale clause, contending, *inter alia,* that the due-on-sale clause constituted an unreasonable restraint on alienation.

After trial, the district court acknowledged that in *Malouff v. Midland Federal Savings & Loan Association,* 181 Colo. 294, 509 P.2d 1240 (1973), we had held a due-on-sale clause to be a reasonable restraint on alienation in the case of an outright sale, but concluded that the exercise of the clause in the case of an installment land contract was an unreasonable restraint on alienation.

Columbia appealed, contending that the trial court erred in its conclusion that the due-on-sale clause constituted an unreasonable restraint on alienation and in two evidentiary rulings. Because of our resolution of the first question, we need not address the propriety of the evidentiary rulings.

### II.

The primary question before us is whether the due-on-sale clause constitutes an unreasonable restraint on alienation as applied to installment land contracts.[2]

---

1. A due-on-sale clause permits the lender to accelerate the loan when the property that secures the loan is sold. The clause in question provided:

   "In the event of the sale or transfer of the real property herein described, at the election of the Association or holder, the entire balance of the note may become due and payable. If the Association or its assigns agrees that the loan may be transferred and as-

   sumed by the purchaser, a reasonable fee for such assumption not to exceed one percent of the principal balance may be assessed."

2. Some courts and commentators have concluded that the due-on-sale clause is not a restraint on alienation at all. *See, e.g., Occidental Savings & Loan Association v. Venco,* 206 Neb. 469, 293 N.W.2d 843 (1980). *See also Williams v. First Federal Savings & Loan Asso-*

In *Malouff, supra,* we held that the due-on-sale clause involved there was a reasonable restraint on alienation. The transaction at issue was an outright sale, rather than an installment land contract. We stated that "the question of the invalidity of a restraint depends upon its reasonableness in view of the justifiable interests of the parties." 181 Colo. at 300, 509 P.2d at 1243.[3]

The trial court distinguished *Malouff* from the case at hand in four respects. First, in the case of an outright sale, the seller divests himself of all interest in the property, while a seller under an installment land contract retains an interest in receiving payments for his equity. Second, in *Malouff* the buyer agreed to assume the loan. Therefore, while the seller remained liable on the note, he had only a nominal interest in seeing that waste was prevented on the property or that payments were made to the lender. In contrast, under an installment sale the seller remains responsible for seeing that the lender is paid and also has a substantial interest in ensuring that the payments are made in order to protect his equity. Third, the seller under an installment contract has a continuing interest in ensuring that neither waste nor depreciation occurs because the seller may have to repossess the property in the event of default. Fourth, in *Malouff* the purchaser assumed personal liability for the note and deed of trust, whereas here the purchaser did not. For the reasons more fully set out below, we do not agree with the trial court that these distinctions mandate different treatment of the two kinds of transactions for purposes of enforcement of due-on-sale clauses.

■ A lender has two primary reasons for including due-on-sale clauses in mortgage instruments. The first is to protect the lender's security interest by ensuring the creditworthiness of the new buyer. The lender's right to accelerate provides an opportunity to evaluate the credit of the buyer and accelerate if the buyer is not a good risk. Historically, this was the principal purpose of the clause. *Holiday Acres No. 3 v. Midwest Federal Savings & Loan Association,* 308 N.W.2d 471 (Minn.1981). The second, and increasingly important, purpose of the clause is to enable the lender to keep its loan portfolio at more nearly current rates of interest and thereby protect its economic position in the money marketplace. *See Williams v. First Federal Savings & Loan Association,* 651 F.2d 910 (4th Cir.1981).

The petitioners argue, and the trial court held, that the lender's interest in ensuring the creditworthiness of the purchaser under an installment land contract is not as great as in the case of an outright sale. When an outright sale is involved, the original purchaser retains no interest in the property, although he might remain liable on the note. Therefore, he has a decreased incentive to ensure that payments are made to the lender and that waste to the property is prevented. On the other hand, petitioners argue, in the case of an installment land contract the seller remains liable on the note and retains some equity in the property; thus he has a substantial interest in ensuring that the payments to the lender are made.

We believe that even in the case of an installment land contract the lender retains a strong interest in the creditworthiness of the purchaser, because the continuing liability of the original purchaser does not, in itself, guarantee the maintenance of the security. When the original purchaser

---

*ciation,* 651 F.2d 910 (4th Cir.1981); *Dunham v. Ware Savings Bank,* 423 N.E.2d 998 (Mass. 1981); *Enforcement of Due-on-Transfer Clauses,* 13 Real Prop., Prob. & Tr.J. 891 (1978). We need not concern ourselves with the question of whether such a clause is a restraint on alienation because we rest our decision on the conclusion that even if it is such a restraint it is a reasonable one, and enforcement should be granted.

**3.** We note that section 38–30–165, C.R.S.1973 (1982 Repl. Vol. 16A), which limits the exercise of due-on-sale clauses, is inapposite, as it does not apply to instruments executed prior to July 1, 1975. *Von Ehrenkrook v. Midland Federal Savings & Loan Association,* 196 Colo. 179, 585 P.2d 589 (1978).

gives up possession of the property and all or a portion of his equity in it, the two principal incentives to make his mortgage payments and to maintain the integrity of the security are diminished. In some ways, the lender's interest in ensuring the credit-worthiness of a purchaser who takes "subject to" the mortgage is actually greater than in the case of an outright sale. An assuming buyer has personal liability on the note, giving him an incentive to maintain the security. A purchaser who merely takes "subject to" has less at stake should default occur, as he will not be liable for a deficiency judgment.

The other principal purpose of the due-on-sale clause is to give the lender an opportunity to increase the interest rate on the loan and thus to update its portfolio to more current rates of return. A determination of the reasonableness of this interest requires a brief review of the business practices of savings and loan associations.

Testimony at the trial indicated that savings and loan associations typically "borrow short" and "lend long." This is often referred to as "maturity intermediation." Savings institutions derive the money they lend from short-term savings deposits, which are demand accounts having uncertain maturities, and certificates of deposit, which have specific maturity dates. The "lending long" aspect of the formula is represented by the historically predominant use of the deposited funds for long-term permanent mortgage loans. The trial court found that if a lender did not have some reasonable method of turning over some portion of its loan portfolio before maturity date, borrowers would be required to pay a higher rate of interest in anticipation of the inflation that might occur during the life of a loan, which is ordinarily from 20 to 30 years. The trial court further found that most savings and loans, including Columbia, assume an average life of a loan that is less than the period shown on the document, with the average life of a mortgage loan being eight years for residential property and twelve years for commercial or income property. On the other hand, the average maturity for savings accounts is approxi-mately one year. Thus, if interest rates increase, the amount that savings institutions must pay out in interest increases more rapidly than their return on long-term fixed-rate mortgages. Therefore, in determining the interest rate to be charged on long-term mortgages, predictions of future short-term interest rates are necessary, as are predictions of the expected duration of the mortgage loans. By including a due-on-sale clause in the mortgage instrument, the lender is intending to bind itself to its predictions of short-term interest rates only for the length of time that the borrower owns the property.

Since the mid-1960's, interest rates have tended to increase. *Enforcement of Due-on-Transfer Clauses,* 13 Real Prop., Prob. & Tr.J. 891 (1978). Consequently, the longer the loan term, the higher the interest rate charged. In an era of increasing interest rates, prohibiting the enforcement of due-on-sale clauses would result in an increase in the average length of the loan, resulting in a less favorable spread between the cost of money to savings institutions and the amount they earn on money previously lent. This would, in turn, necessitate an increase in the interest rate of new loans, allowing old borrowers to benefit at the expense of new ones.

■ We are in agreement with the trial court that the lender has a justifiable interest in preserving its security against waste and depreciation and in protecting itself and its depositors from the hazards of long-term loans by a policy that permits adjustment of the interest rate to reflect current market rates. Where we part company with the trial court, however, is in the weight to be attached to the interests of the petitioners.

Three of the interests which the trial court found controlling were: (1) the "very strong interest in the free alienability of their property"; (2) "their right to realize the full extent of the value of their property interest upon sale"; and (3) "an interest in minimizing their so-called losses, or that is, in changing their situation to their eco-

nomic advantage when the income realized from the property which they purchased does not meet the expectations which they had upon purchase."

In order to assign the proper weight to the petitioners' interest in the free alienability of their property, we must first ascertain the quantum of restraint that is actually imposed by the due-on-sale clause. It is apparent from the clause itself that there is no direct restraint on alienation. Alienation is not forbidden; it merely gives the lender the opportunity to invoke the acceleration clause. Consequently, if a restraint is involved, it is at most an indirect restraint. *See Crockett v. First Federal Savings & Loan Association,* 289 N.C. 620, 224 S.E.2d 580 (1976).

It is true that property bearing an automatically assumable mortgage with a fixed interest rate that is below the current market rate will be easier to sell than property bearing a mortgage with a due-on-sale clause. However, it will be at least as easy to sell as equivalent unencumbered property, and it may be easier because the interest rate might not be adjusted all the way up to market rate. Thus, the mortgage as a whole does not restrain alienation; it is only when the due-on-sale clause is considered in isolation that there is an apparent impediment to sale.

An analysis that focuses on a contractual provision in isolation may result in a finding that any number of provisions are restraints on alienation. For example, some courts have suggested that the lender's interest in maintaining the return on its portfolio could be protected by using variable-rate mortgages. *See, e.g., Wellenkamp v. Bank of America,* 21 Cal.3d 943, 582 P.2d 970, 148 Cal.Rptr. 379 (1978). Yet, a variable-rate provision considered in isolation may have some of the same effects as the due-on-sale clause, because in an inflationary period property with an automatically assumable fixed-rate mortgage will be easier to sell than one with an automatically assumable variable-rate mortgage. In both cases it appears that an inflationary economy is the real impediment to sale.

The quantum of restraint on alienation is therefore quite small. At most, the clause eliminates a certain class of potential buyers—those who cannot or will not obtain their own financing. It has this effect not by imposing any direct restraint on alienation of the property itself, but by restricting the alienability of the loan.

■ The trial court's reliance on the petitioners' "right to realize the full extent of the value of their property interest upon sale" reflects a mistaken understanding of the economic effect on the original purchaser of the exercise of the due-on-sale clause. When a loan is assumed, or when property is sold "subject to" the mortgage, two separate transactions occur. First, the real property is alienated, and the seller receives the intrinsic value of the property. This is the seller's true equity. Second, the benefit of the loan is transferred. To the extent that the loan is at a lower interest rate than the market rate, the seller is able to obtain a premium for his property. *See Enforcement of Due-on-Transfer Clauses, supra.* This premium is a false equity that is not a result of any characteristic inherent in the property itself; instead, it is a product of the alienation of the lower-than-market loan. The enforcement of a due-on-sale clause does not affect the seller's ability to recapture his true equity; it merely eliminates the premium of the false equity. Therefore, the trial court was in error in concluding that the due-on-sale clause impaired the ability of the petitioners to realize the full value of their property.

■ The third justifiable interest of petitioners found by the trial court of "minimizing their so-called losses . . ." is difficult to interpret in any way other than to mean the interest of a party in avoiding the terms of a contract when they are no longer to his advantage. Needless to say, this is not an interest ordinarily protected by the law. *See Thurmon v. Skipton,* 157 Colo. 423, 403 P.2d 211 (1965).

It is important to bear in mind just what the petitioners are asking of us. The due-on-sale clause was of benefit to both Colum-

bia and Huttner at the time the deed of trust was accepted by Huttner. It was also of benefit to the Sterns when they assumed the loan. The lender obtained the right to accelerate the loan upon the sale of the property, and the borrowers received a lower interest rate than they would have, if there had been no such clause. The petitioners now seek to retain their benefit, but to deprive the lender of its. The action of the trial court can only be seen as an attempt to rearrange the economic rights of the parties. Absent compelling circumstances, not present here, the economic rights of the parties should be as allocated by the parties in the deed of trust.

The trial court also based its decision in part on the fact that the life of the loan in question did not exceed the average term used by the lender in determining the original interest rate. Such reasoning ignores the nature of an average and is entirely irrelevant to the resolution of the issue. If every loan were automatically assumable until it reached the average life of all loans, the inevitable result would be that the average would increase and approach the full term of the loan. The early payoff of some loans balances the later payoff of others. The reasonableness of the lender's action does not depend upon the circumstance of when the loan is paid off.

It is not only the interests of the individual lender and borrower that must be considered in determining the reasonableness of a given practice, but also the interests of society. The doctrine of restraints on alienation arose not so much out of a concern for a particular individual's right to alienate his property as it did from the conclusion that the interests of society as a whole would be better served by free alienation. *See* Volkmer, *The Application of Restraints on Alienation Doctrine to Real Property Security Interests,* 58 Iowa L.Rev. 747 (1973). While it appears that the petitioners would benefit from our striking down the due-on-sale clause, it is far less clear that consumers as a group would be benefited.[4] *See Williams v. First Federal Savings & Loan Association,* 651 F.2d 910, 928 n. 47 (1981). The money that the savings and loan association would lose by our refusal to enforce the clause would have to be made up somewhere if the association were to remain solvent. It can compensate for its loss by either decreasing the interest rate it pays on deposits (and probably be at a competitive disadvantage compared with other forms of investment), or it can charge a higher rate on new loans, with the latter being the more likely result. Thus, there would be, in effect, a transfer of capital from new borrowers to old ones in order to provide unbargained-for benefits to the old borrowers. It is difficult to see how society would benefit from this.

Invalidation of due-on-sale clauses would also result in a competitive imbalance between federally chartered and state-chartered savings and loan institutions. Regardless of our action today, federally chartered institutions may enforce the clauses. *Fidelity Federal Savings & Loan Association v. De la Cuesta,* —— U.S. ——, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *Haugen v. Western Federal Savings & Loan Association,* 649 P.2d 323 (Colo.1982). If state-chartered institutions cannot enforce them, they will likely be forced to charge a higher rate of interest for new loans than will

4. Federal Home Loan Bank Board, Advisory Opinion No. 75–647 (1975), states in part that:
"The invalidation of the 'due on sale' clause will enable a certain class of sellers to make a fortuitous profit on the sale of homes with relatively recent low-interest loans (and to then sell them more rapidly than other sellers in a tight money market). But it is the Board's firm conviction that such profits will be achieved only at the expense of the general homebuying public, because interest rates on new loans are most likely to be raised to off-set the very substantial loss of savings and loan income flowing directly from the elimination of the 'due on sale' clause, and elimination of the 'due on sale' clause will decrease the supply of housing funds which otherwise would be available. Therefore, viewing consumer interests from a broader perspective, it is the Board's opinion that the elimination of the 'due on sale' clause, at best, will have only a marginal overall consumer benefit, but undoubtedly will cause widespread hardship to the general homebuying public."

federal institutions. This would result in a loss of business to federal institutions or a conversion of state-chartered institutions to federally chartered ones, or both. *See Dunham v. Ware Savings Bank, supra.*

Our invalidation of due-on-sale clauses would also very likely have an adverse impact on the availability of mortgage money in the state. Federal Home Loan Bank Board, Advisory Opinion No. 75–647 (1975). The Federal Home Loan Mortgage Corporation (FHLMC) is the largest buyer in the secondary mortgage market. It purchases mortgages (or interests in mortgages) from primary lenders, pools them, and sells them to institutional investors in the form of mortgage pass-through securities. The sale of mortgages in the secondary market provides an influx of additional dollars to savings and loan associations, which may then be used to make new loans. Without this ability, savings institutions would be limited in their mortgage originations to the amount of savings deposits they attract, loan repayments they receive, and money they borrow.

■ According to its *amicus curiae* brief filed in this case, the FHLMC views a transfer without the opportunity to review the credit standing of a transferee as a risk to the holder's investment. Consequently, in some states that have prohibited the exercise of due-on-sale clauses, the FHLMC has stopped buying mortgages. The possibility of a substantial diminution in the supply of mortgage funds is a factor we cannot ignore in determining the overall reasonableness of the due-on-sale clause.

■ A final question that must be resolved is whether the enforceability of a due-on-sale clause must be determined under the circumstances of each case. We did not expressly state in *Malouff* whether a case-by-case analysis was required. Petitioners argue that our opinion in *Von Ehrenkrook v. Midland Federal Savings & Loan Association,* 196 Colo. 179, 585 P.2d 589 (1978), recognized that a case-by-case analysis was appropriate. In *Von Ehrenkrook,* in concluding that section 38–30–165, C.R.S.1973 (1977 Supp.), was not merely a codification of the existing common law, we stated:

> "In *Malouff* we held that an increase of the interest rate on an assumed note of 1% was not an unreasonable restraint on the alienation of real property. In reaching that decision we considered many factors including the current market rate of interest. Clearly *Malouff* does not stand for the proposition that prior to the enactment of section 38–30–165(1)(b), any increase over 1% would always be illegal or that a 1% increase would always be legal."

196 Colo. at 182, 585 P.2d at 591.

Despite language in our previous opinions that could be interpreted as requiring a case-by-case analysis, we believe the better rule to be otherwise. The justifiable interests of the parties will be substantially the same in all cases. A requirement that the lender in each case prove the reasonableness of his interests prior to enforcement of the due-on-sale clause would have a detrimental impact on the stability of land titles. Moreover, it would routinely involve courts in decisions that are better made elsewhere, such as whether a subsequent purchaser is creditworthy and how much the interest rate should be increased upon assumption.[5]

---

5. We note that for loans involving residential property made on or after July 1, 1975, section 38–30–165 imposes a limit of one percent on an interest rate increase to a creditworthy purchaser in such a situation. *See Kemp v. Empire Savings, Building & Loan Association,* 660 P.2d 899 (1983). It should also be noted that the United States Congress has recently enacted legislation that substantially preempts state law in this area. Section 341 of the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1505, which permits the exercise of due-on-sale clauses according to the terms of the loan contract, will become fully effective on October 15, 1985. From October 15, 1982—the date the Act was signed—until October 15, 1985, prior state law prohibiting the exercise of a due-on-sale clause will be given effect as to loans entered into after the adoption of the state law and prior to October 15, 1982. This "window exception" is inapplicable to loans originated by federal savings and

We see no reason to limit the business judgment of lenders in that fashion.

Due-on-sale clauses are *per se* reasonable restraints on alienation. As such they may be challenged only on the ground that the lender, in the exercise or enforcement of the clause, has engaged in unconscionable conduct. The party seeking to avoid the exercise or enforcement of a contract voluntarily entered into, however, must bear the burden of showing why the lender should not be permitted to enforce the provision. The petitioners here have not met this burden.[6]

The judgment of the district court is reversed, and the cause is remanded for proceedings consistent with the views expressed in this opinion.

loan associations, which are governed by *De la Cuesta, supra.*

**6.** See *Rustic Hills Shopping Plaza, Inc. v. Columbia Savings & Loan Association,* 661 P.2d 254 (1983); *Kemp v. Empire Savings, Building & Loan Association,* 660 P.2d 899 (1983);

*Krause v. Columbia Savings & Loan Association,* 661 P.2d 265 (1983) (upholding the enforcement of due-on-sale clauses under different factual circumstances).