**CENTRAL NATIONAL BANK OF GREENCASTLE, Appellant (Plaintiff Below),**

v.

**Dale L. SHOUP, Janice J. Shoup, Robert G. Fisher and Joan B. Fisher, Appellees (Defendants Below).**

No. 4–484A95.

Court of Appeals of Indiana, Fourth District.

Dec. 17, 1986.
Rehearings Denied Feb. 13, 18, 1987.

James A. Strain, Stanley C. Fickle, Richard A. Cohen, Barnes & Thornburg, Indianapolis, Robert A. Hutchens, Wilson, Hutchens & Reese, Greencastle, for appellant.

James L. Crawford, Effner, Wagner & Crawford, Terre Haute, Clelland J. Hanner,

Gary G. Hanner, Hanner Hanner & Hanner, Rockville, Roy C. Sutherlin, Sutherlin & Zeiner, Greencastle, for appellees.

YOUNG, Judge.

Central National Bank of Greencastle appeals a jury award and judgment in favor of Dale L. and Janice J. Shoup and Robert G. and Joan B. Fisher upon their counterclaim for abuse of process, breach of fiduciary duty and fraud.

This litigation was commenced by the bank when it sought to foreclose its mortgage upon real property owned by the Shoups. The mortgage provided, in part, as follows:

> The indebtedness secured by this mortgage can not be assumed without the written approval of the Mortgagee, and in the event, the mortgaged real estate is sold or conveyed the indebtedness secured by this Mortgage shall, at any time thereafter, at the option of the Mortgagee become immediately due and payable.

The bank complained that the Shoups had sold the mortgaged property to the Fishers on land contract in violation of this due-on-sale clause entitling it to accelerate its debt and foreclose its mortgage. The Shoups denied the complaint, asserted certain affirmative defenses and counterclaimed for abuse of process, breach of fiduciary duty and negligence. The Fishers, joined as defendants, answered similarly denying the bank's complaint and counterclaiming alleging estoppel, negligence and fraud. The bank's complaint was tried by court. The trial court entered judgment against the bank on its foreclosure complaint and in favor of the Shoups and the Fishers following the jury's advice. Following our order on remand, 483 N.E.2d 75, the trial court made extensive findings of fact and conclusions of law. The bank appeals. It contends that 1) the judgment in favor of the Shoups and Fishers is contrary to law, 2) the judgment against the Bank on its complaint for foreclosure is contrary to law, and 3) the use of an advisory jury was error.

We affirm the trial court's judgment as to the Shoups but reverse as to the Fishers.

Central National is a commercial bank doing business in Putnam County. The Shoups were residents of Greencastle. When Mr. Shoup retired in 1978, they decided to move to Florida and build their retirement home. Needing money to do so, they asked for a loan from the bank secured by their house in Greencastle. They planned to use the money to build their new home in Florida and pay the loan by selling their Greencastle property. The bank granted a twenty year term loan at 10% interest secured by a mortgage on the Greencastle property. The loan documents were executed on October 27, 1978. The mortgage contained the due-on-sale clause referred to above. Proceeds of the loan were paid out to build the Florida house which was completed in March of 1979. The Shoups moved to Florida in June of that year. The sale of the Greencastle house made in May of 1979 fell through. Late in 1980, the Shoups received an offer from the Fishers to purchase the Greencastle house on contract. They accepted the offer and signed the agreement prepared by a local attorney, Roy Sutherlin. The Fishers planned to pay off the contract when their former house in Michigan was sold. The Shoups planned to then pay the bank their loan balance. The contract was executed and recorded on December 18, 1980. A few days later Mr. Monnet, an officer of the bank, called Mrs. Shoup, advising her that the sale triggered the due-on-sale clause and that the debt would have to be paid or refinanced at a higher rate of interest. Negotiations regarding refinancing followed, the bank suggesting that it would refinance at a 13½ interest rate with a three year rollover and later at 12% interest per year for three years. There was no response from the Shoups. Suit commenced on September 10, 1981.

The bank was not concerned about security for its loan. Its sole purpose was to increase the rate of interest on the loan to match its lending rates with the cost of obtaining its funds. The trial court found for the Shoups on the theories of abuse of

process, fraud, negligence and breach of a fiduciary duty. Judgment was entered for the Shoups in the amount of $125,000 representing $75,000 in compensatory damages and $50,000 in punitive damages. The Fishers were granted judgment on the theories of fraud and abuse of process. They were awarded a total of $60,000, consisting of $10,000 in compensatory damages and $50,000 in punitive damages. Central National appeals, asserting that the trial court's decision was either clearly erroneous or contrary to law.

We may not reverse a trial court's decision and its related findings unless they are clearly erroneous. *Peoples Trust & Sav. Bank v. Humphrey* (1983), Ind.App., 451 N.E.2d 1104, 1112. It is also clear that in order:

> [t]o sustain an action for fraud it must be proven that a material representation of a past or existing fact was made which was untrue and known to be untrue by the party making it or else recklessly made and that another party did in fact rely on the representation and was induced thereby to act to his detriment. *Fleetwood v. Mirich* (1980), Ind.App., 404 N.E.2d 38, 42.

> Additionally, and particularly relevant to this case, when parties to a contract have a prior understanding about the contract's terms, and the party responsible for drafting the contract includes contrary terms and then allows the other party to sign it without informing him of changes, the drafter's conduct is fraudulent. *McNair v. Public Sav. Ins. Co. of America* (1928), 88 Ind.App. 386, 163 N.E. 290.

> ... *Concealment becomes fraudulent only when it is the duty of the party having knowledge of the facts to discover them to the other; and this brings back the question, When does such duty rest upon either party to any transaction: All the instances in which the duty exists, and in which a concealment is therefore fraudulent, may be reduced to three distinct classes.* These three classes are, in general clearly distinct and separate, although their bound-

aries may sometimes overlap, or a case may fall within two of them.... 2. *The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction expressly reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is necessarily implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances.* The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances.

*Id.* at 1112 (emphasis in original) (quoting *McNair v. Public Sav. Ins. Co. of North America* (1928), 88 Ind.App. 386, 163 N.E. 290, 293).

■ In the present case, the Shoups discussed their need for financing with two of Central National's officers, Aker the bank President and Monnett the Senior Vice President. The Shoups related that Dale Shoup was retiring and the couple planned to build a house in Florida. In order to do so, the Shoups wanted to borrow money using their Greencastle house as security, sell the Greencastle house and pay off the entire loan with the proceeds. The Shoups wanted a short term or temporary loan to carry out these plans. The parties agreed that the money would be loaned and the Shoups would repay the loan in full upon the receipt of the proceeds from the sale of their house.

The bank prepared a note and mortgage papers for the Shoups to sign. A bank secretary who had never before been responsible for closing a loan of this type presented the loan papers to the Shoups for signature in the bank lobby. The Shoups

perused the documents but did not read the documents in their entirety. The agreements provided for a 20–year fixed 10% interest rate loan which contained a due-on-sale clause and a prepayment penalty clause. Neither of these clauses were pointed out to the Shoups or discussed with them prior to the signing of the documents.

The Shoups listed their house for sale and moved to Florida on the mistaken belief that they had successfully sold the house. However, the deal fell through and the Shoups relisted the property. The Shoups received no offers on the property until over a year later when the property was sold to the Fishers on land sale contract. At that time, Central National notified the Shoups that the sale violated the due-on-sale clause and the bank would foreclose unless the Shoups agreed to renegotiate the interest rate on the loan. The Shoups continued to make their monthly payments and Central National admitted that its security was never threatened by the sale. It was against the bank's policy to allow assumptions of mortgages even though the due-on-sale clause suggested that an assumption might be possible if the bank agreed. The bank also acknowledged that it was a full service bank that provided loan advice to its customers in the hopes that the customers would follow its suggestions. The bank's policy and philosophy was that a good bank offers more than money and can offer good advice based on experience when an important investment is made. Monnett also testified that the bank should have pointed out the due-on-sale clause to the Shoups prior to their signing the documents and that this was not done.

Under these facts, the trial court found:
a) That Central National represented one set of contractual terms to the Shoups in negotiating the loan in question;
b) then drafted other and more odious terms;
c) allowed the Shoups to execute the note and mortgage based upon their original understanding but containing the latter terms; and,

d) then further attempted to apply the unfair terms and in particular the acceleration clause.

The trial court also found that Central National knew of the Shoups' intent to sell the land on contract and failed to notify the Shoups that the bank considered this a violation of the due-on-sale clause contained in the mortgage. The evidence presented clearly supports both these findings and the judgment in favor of the Shoups under the theory of fraud.

 Central National also argues that the award of punitive damages was improper. Punitive damages are designed to punish the wrongdoers and dissuade others from similar conduct in the future. *Orkin Exterminating Co., Inc. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1022. They are awarded when clear and convincing evidence is presented that

> is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.

*Id.* at 1023 (quoting *Travelers Indem. Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349).

In the present case, Central National represented one set of terms to the Shoups but included others in the loan documents. The bank was contacted by the Shoups' counsel to obtain information for the land sale contract, and knew of the due-on-sale clause in the mortgage but failed to inform the attorney or the Shoups that the bank would consider the sale a violation of the mortgage and foreclose. The Shoups were then placed in a position of living in Florida and facing a foreclosure action in Indiana although their loan payments were current. The Shoups had not received the proceeds from the sale of their Greencastle house and the bank was aware of this when it filed suit. The bank was also aware that the Shoups intended to comply with their original agreement to pay the loan upon receipt of the proceeds from the sale of the house. The due-on-sale clause was enforced solely to force the Shoups to renego-

tiate the original mortgage and as a test case, not because the bank's security was threatened. The Court of Appeals, First District, found facts similar to these to be inconsistent with "noniniquitous human failing" and sufficient to support an award of punitive damages. *Peoples Trust & Sav. Bank v. Humphrey, supra* at 1114. We agree and affirm the award of punitive damages to the Shoups.

Central National argues that the judgment in favor of the Fishers was contrary to law. We agree.

Central National argues that its use of a foreclosure action to force the payment of a higher interest rate was not an abuse of process. Under the circumstances presented, we agree but hold that a security interest must be threatened before a due-on-sale clause may be enforced. We determine this case not to be abuse of process only because it presented an issue of first impression in this state.

 Abuse of process requires a finding that the legal process has been utilized to achieve an end other than one which the process was designed to accomplish. The only important factor is the purpose for which the process is utilized. *Display Fixtures Co. v. R.L. Hatcher, Inc.* (1982), Ind. App., 438 N.E.2d 26, 31. The party asserting abuse of process must show an ulterior motive and use of process that would not be proper in the normal prosecution of the case. *Brown v. Robertson* (1950), 120 Ind. App. 434, 92 N.E.2d 856. "A regular and legitimate use of process, though with an ulterior motive or bad intention is not a malicious abuse of process." *Id.* Unlike malicious prosecution, abuse of process does not require proof that the action was brought without probable cause or that the action would have terminated in favor of the party asserting abuse of process. *Cassidy v. Cain* (1969), 145 Ind.App. 581, 251 N.E.2d 852, 857.

 In the present case, the trial court found that Central National's major reason for bringing its foreclosure action was to make a profit on its loan to the Shoups by forcing the Shoups to accept an interest rate higher than the one provided for in the original mortgage. The court concluded that using the legal action to force acceptance of a higher interest rate constituted an abuse of process. The underlying issues are twofold:

1) whether a due-on-sale clause is applicable to a land sale contract where no assumption of mortgage has taken place; and

2) whether a due-on-sale clause may be utilized to force the acceptance of a higher interest rate when land is sold by contract.

Courts have uniformly held that a sale by installment contract constitutes a transfer for purposes of a due-on-sale clause. *See Rustic Hills Shopping Plaza, Inc. v. Columbia Sav. & Loan Ass'n.* (1983), Colo., 661 P.2d 254; *see also* Dunn & Nowinski, *Enforcement of Due-On-Transfer Clauses: An Update,* 16 Real Prop., Prob. & Tr.J. 291 (1981); Annot., 22 A.L.R. 4th 1266 (1983). However, courts have not agreed on the burden of proof a lender must meet in order to enforce the clause or on the scope of the clause once deemed enforceable. Courts have generally fallen into two categories: 1) Some courts hold the clause to be an unreasonable restraint on alienation and require the mortgagee to bear the burden of proving the use of the clause is justifiable under the circumstances. Evidence that the transfer has impaired the mortgagee's security or enhanced the likelihood of default or foreclosure is normally required. This approach does not permit the use of the clause solely to force renegotiation of an interest rate. *See e.g., Olean v. Treglia* (1983), 190 Conn. 756, 463 A.2d 242; *Boyes v. Valley Bank of Nevada,* (1985), 101 Nev. 287, 701 P.2d 1008.

2) Other jurisdictions hold either that any restraint on alienation created by due-on-sale clauses is reasonable or that due-on-sale clauses are not a restraint on alienation. This line of authority generally reconizes two purposes for which lenders use due-on-sale clauses:

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

a) to protect the lender's security interest by assuring the creditworthiness of the new buyer; and

b) to enable the lender to keep its loan portfolio at a more nearly current rate of interest and thereby protect its position in the money marketplace.

*Income Realty & Mortgage, Inc. v. Columbia Sav. and Loan Ass'n* (1983), Colo., 661 P.2d 257, 260. *See also Olean v. Treglia* (1983), 190 Conn. 756, 463 A.2d 242, 248. Under this approach "[t]he 'due-on-sale' clause is presumed to be a legal and reasonable restraint on alienation unless the *mortgagor* establishes that its enforcement, in that particular case, is unconscionable or inequitable." *Olean, supra* 463 A.2d at 248. *See also e.g., Williams v. First Federal Sav. & Loan Ass'n* (1981), 4th Cir., 651 F.2d 910, 915–16, 926–28; *Weiman v. McHaffie* (1985), Fla., 470 So.2d 682, 684; *Frets v. Capitol Federal Sav. & Loan Ass'n* (1986), 238 Kan. 614, 712 P.2d 1270.

Under this approach, the lender would be permitted to enforce a due-on-sale clause when sale by an installment land contract occurred even if there has been no impairment of security. *United Savings Bank Mutual v. Barnette* (1985), 72 Or.App. 46, 695 P.2d 73; *Redd v. Western Sav. & Loan Co.* (1982), Utah, 646 P.2d 761; *Dunham v. Ware Savings Bank* (1981), 384 Mass. 63, 423 N.E.2d 998. Several grounds are listed to support this position:

a) a due-on-sale clause represents an equitable adjustment of rights between the lender and borrower upon transfer;

b) state chartered banks would be disadvantaged if clauses were not enforced because federally chartered institutions are permitted to use the clauses; and

c) the reallocation of benefit derived from the lower interest rate will benefit future borrowers as a whole because it permits banks to turn loans over at a faster rate and therefore loan money at lower interest rates than would be possible if the bank were forced to honor the original interest rate after a transfer of property occurred.

*Dunham, supra* 423 N.E.2d at 1002–1004.

Indiana has followed the line of reasoning that holds a due-on-sale clause to be a restraint on alienation. As such, these clauses will be strictly construed. *First Sav. and Loan Ass'n of Central Indiana v. Treaster* (1986), Ind.App., 490 N.E.2d 1149, 1152. We will not rewrite due-on-sale clauses to include terms and prohibitions not originally provided. *See, Peoples Federal Sav. and Loan Ass'n of East Chicago, Indiana v. Willsey* (1984), Ind.App., 466 N.E.2d 470. Having analyzed the two lines of authority giving effect to due-on-sale clauses in land sale contracts, we believe the correct analysis requires a showing that the lender's security interest has been threatened.[1]

▆▆▆ Although we find that Central National was under a duty to show that its security interest was threatened or impaired by the sale of the property, we cannot agree that the bringing and pursuit of this action was an abuse of process. Central National admittedly utilized this action and the due-on-sale clause to attempt to force the payment of a higher interest rate rather than to protect its security interest. While we do not condone this practice, we also cannot label it an abuse of process since Indiana has not previously addressed this issue and since there is a split of authority in other jurisdictions as to whether this practice was proper. At the time Central National filed and pursued its action, it was not clear whether Indiana would require a lender to show a threatened security interest before enforcing a due-on-sale clause. If this court had

---

1. We also recognize that recent federal legislation may result in the enforcement of due-on-sale clauses to force payment of higher interest rates in the future. However, this legislation is not retroactive and plays no role in this action since the transactions involved occurred prior to the enactment of the federal legislation. *See*

*e.g. Boyes v. Valley Bank of Nevada* (1985), 101 Nev. 287, 701 P.2d 1008, 1011. We would also note that even if the legislation were applied to this action, our result would be the same since the terms of the contract are ambiguous and contrary to the terms agreed to by the parties.

aligned itself with the second line of authority previously discussed, Central National clearly would have been acting properly in bringing this action in order to obtain either full payment of the loan or a renegotiated interest rate. To label the action an abuse of process at this juncture would dissuade litigants from pursuing actions which may present a case of first impression. Under these circumstances, we determine that Central National did not abuse the legal process in bringing this action since it was not clear whether Indiana would permit the use of a foreclosure action to force payment of a higher interest rate.

■ Even if we concluded that Central National had abused the process in bringing the actions against the Shoups, we could not reach the same conclusion as to the Fishers. The Fishers were included in the action because of their potential interest in the property. There is no evidence that the bank sought or intended to obtain anything from the Fishers. The action was not aimed at extracting higher interest rates from the Fishers or pressuring the Fishers into performing any act. The bank's efforts to obtain additional interest were aimed solely at the Shoups. A wrong against one party does not automatically constitute a wrong against another. There is no evidence that Central National attempted to utilize the legal process to force the Fishers into altering their position or paying additional amounts. The bank never sought any remedy, award or compensation from the Fishers. The bank's inclusion of the Fishers in the action was proper because of their interest in the property. There was no evidence that the process was ever used by the bank to obtain anything, properly or improperly, from the Fishers. Therefore, no abuse of process occurred as between Central National and the Fishers.

■ The trial court's determination that the clause was not enforceable was, however, correct. Central National presented no evidence that its security interest was threatened in any manner by the land sale contract between the Shoups and Fishers. In fact, the bank admitted that its sole purpose in utilizing the due-on-sale clause was to force the Shoups to accept a higher interest rate. This court will not condone the use of due-on-sale clauses for this purpose and will continue to strictly construe these types of clauses.

For the reasons previously stated, we affirm the trial court's determination that Central National could not utilize the due-on-sale clause to extract higher interest rates from the Shoups, but reverse the trial court's judgment that the bank's filing and pursuit of this action constituted an abuse of process.

The trial court also found for the Fishers on the theory of fraud. We find this judgment to be contrary to law.

■ Fraud generally comprises "all acts, omissions, and concealments involving a breach of legal or equitable duty and resulting in damages to another." *Plymale v. Upright* (1981), Ind.App., 419 N.E.2d 756, 759 (quoting *Daly v. Showers* (1937), 104 Ind.App. 480, 485–86, 8 N.E.2d 139). Thus, the party accused of fraud must have a duty to disclose the concealed information to the party alleging fraud. In the present case, no relationship existed between Central National and the Fishers that gave rise to a duty. There was no evidence that the Fishers had any dealings with the bank, discussed the sale with the bank or placed any trust or confidence in the bank. Their sole dealings were with the Shoups, and the Fishers remedies, if any, are against the Shoups, not Central National. The only contact the Fishers ever had with the bank were after they had entered the land sale contract. These contacts were limited to depositing funds into the Shoups' account and on one occasion, speaking with a bank employee about the possibility of assuming the mortgage and being told the matter was currently in the hands of the bank's attorneys. There was no evidence that the Fishers communicated with the bank prior to entering the land sale contract. Because there is no relationship which created a duty requiring Central

National to provide the Fishers information, there can be no fraud. The bank's fraudulent conduct towards the Shoups does not provide the Fishers a basis for recovery. The bank must have been under a duty to provide the Fishers information, and no such duty existed. The trial court's ruling was therefore contrary to law and must be reversed.[2]

■■■ Central National's last argument is that the trial court improperly utilized the advisory jury, thus, necessitating a new trial. Indiana Trial Rule 39(B) permits trial courts to "submit any or all" issues for which there is no right to trial by jury to an advisory jury. The verdict returned by the jury is advisory unless the parties consent to it being treated as a verdict by a non-advisory jury. T.R. 39(B). It is presumed that a trial court correctly decided issues placed before it and correctly determined the law. *Farmers Bank and Trust Co. v. Ross* (1980), Ind.App., 401 N.E.2d 74, 76; *Ernst v. Sparacino* (1978), 177 Ind.App. 610, 380 N.E.2d 1271, 1278–79 (abrogated in part and on other grounds by *Sims v. Huntington* (1979), 271 Ind. 368, 393 N.E.2d 135). This presumption may be rebutted by evidence that clearly shows "the trial court committed serious error which denied [appellant] the relief to which he was entitled under law." *Ernst v. Sparacino, supra,* 380 N.E.2d at 1279.

In the present case, the record clearly reflects that the trial court did not treat the jury verdict as one from a non-advisory jury. Rather, the trial court stated that it had "received and considered the verdicts of the advisory jury" with respect to the counterclaims. The record also reveals that the trial court submitted only the counterclaim issues to the jury and instructed the jury that it was for the court to decide whether the bank was entitled to

pursue its foreclosure action. The mere fact that a trial court follows the verdict of an advisory jury does not make the judgment suspect. In fact, Indiana Trial Rule 39(D) notes that when the trial court chooses to follow the verdict, it is not even required to submit findings of facts on those issues. The record clearly demonstrates the trial court was aware of the respective roles of the advisory jury and the court.

Central National presents no evidence that clearly shows the trial court acted improperly when considering the jury verdict. The failure of the trial court to enter special findings at the time of the judgment does not support a conclusion that the trial "court did not consciously deliberate on and decide the issues in this case before entering judgment" as suggested by Central National. Special findings are not designed to assure the trial court's proper performance of the decision-making process. Rather, they serve to "provide the parties and the reviewing courts with the theory upon which the case was decided." *Sandoval v. Hamersley* (1981), Ind.App., 419 N.E.2d 813, 816. The special findings made upon this court's request served this purpose and were utilized and discussed by Central National in its brief.

■■■ Central National also appears to argue that the trial court should not have even utilized an advisory jury in this type of action. However, the bank voiced no objection to the use of an advisory jury at trial and cannot complain of its use for the first time on appeal. *See Wisconics Engineering, Inc. v. Fisher* (1984), Ind.App., 466 N.E.2d 745, 453. We conclude that the trial court properly utilized and considered the advisory jury's verdict in reacting its judgment.

2. The Fishers' reliance on *Kelley v. Fisk* (1887), 110 Ind. 552, 11 N.E. 453, is misplaced. In *Kelley,* the party accused of fraud was present when her husband told another party that a mortgage had been paid off. The wife was aware that this was not true but did not contradict her husband or attempt to tell the other party of the falseness of the statement. The wife later attempted to assert that the mortgage had in fact not been paid off and had priority over the second party's mortgage. These circumstances are substantially different from the facts of this case in that the bank was not present when any statements were made to the Fishers and, therefore, had no duty to speak.

The trial court's judgment is affirmed as to the Shoups and as to the denial of Central National's claims against the Shoups and Fishers, and reversed as to the judgment on behalf of the Fishers.

CONOVER, P.J., concurs.

MILLER, J., concurs and dissents with separate opinion.

MILLER, Judge, concurring and dissenting.

While I concur with much of the majority decision, I must dissent from the affirmance of the trial court's judgment in favor of the Shoups on the issue of fraud and punitive damages. I cannot agree with the majority on these issues because I cannot find any evidence to support the trial court's finding that the bank represented one set of terms to the Shoups and later drafted another, more odious, set of terms.

The trial court found that, although the Shoups' initially anticipated a short-term financial arrangement of two to three years duration, "the Bank suggested long-term financing and offered to loan the Shoups $55,000.00 on the basis of a 20 twenty year fixed interest rate loan, payable in 240 equal monthly installments of $530.77. Mr. Monnett wrote a letter to the Shoups on October 7, 1985, offering the bank's commitment for such a 20 year loan at a 10% interest rate secured by the Shoup's mortgage on their Greencastle home." When this document was executed, both parties were bound by its terms.

I fail to see how the due-on-sale clause could be viewed as more odious than any previous understanding of the parties— even if there could be such an understanding outside the terms of the mortgage. The Shoups themselves claim the bank agreed the Shoups would pay the remainder of the mortgage when they sold the Greencastle property. The due-on-sale clause provided the same terms, that is, that the Shoups had to pay the remainder of the mortgage when they sold the property. It seems to me that the terms are exactly the same, and are certainly not more odious.

Further, the Shoups failed in their burden of proving that the execution of the long-term standard mortgage rather than a short-term loan was, under the circumstances, to their detriment. Their evidence permits us only to speculate whether the standard long-term mortgage, despite its due-on-sale clause and prepayment clause, was superior or inferior for their purposes to a short-term loan which might mature before the sale of the house or a short-term installment loan with astronomical monthly payments.

The problem here is not that the bank substituted different and more odious terms; rather it is that the parties did not contemplate the possibility the property would be sold on land sale contract. Because they did not, they never reached a common understanding of when the property was "sold" in the event of the execution of a land sale contract. When the later dispute occurred concerning the meaning of the due-on-sale provision, it was not the result of an actionable fraud by the bank.

I must therefore dissent to the majority's affirmance of the trial court's judgment that Central National Bank is liable for fraud, and from their affirmance of the trial court's award of exemplary damages based upon fraud. I concur in the remainder of the majority opinion.