ATTORNEY FOR APPELLANT
FIELDVIEW PROPERTIES, LLC
AND KAREN RUSIN

David J. Tipton
Densborn Blachly, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLANT EAST
POINT BUSINESS PARK, LLC

Geoffrey G. Giorgi
Giorgi & Bebekoski, LLC
Merillville, Indiana

ATTORNEYS FOR APPELLEE

Megan L. Craig
John R. Craig
Craig, Craig & Maroc, LLC
Crown Point, Indiana



# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| East Point Business Park, LLC, Fieldview Properties, LLC, and Karen Rusin, <br><br> *Appellants-Defendants,* <br><br> v. <br><br> Private Real Estate Holdings, LLC, <br><br> *Appellee-Plaintiff.* | December 31, 2015 <br><br> Court of Appeals Case No. 45A05-1412-MF-584 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable John M. Sedia, Judge <br><br> Trial Court Cause No. 45D01-1102-MF-40 |

**Mathias, Judge.**

Appellants-Defendants East Point Business Park, LLC ("East Point"), Fieldview Properties, LLC, ("Fieldview") and Karen Rusin ("Rusin") (collectively "the Defendants") challenge the Lake Superior Court's grant of summary judgment in favor of Appellee-Plaintiff Private Real Estate Holdings, LLC ("PREH"), in PREH's foreclosure action against the Defendants.

We affirm.

## Facts and Procedural History

East Point is a limited liability company formed for the purpose of acquiring a 124-acre parcel of real estate ("the Property") in Crown Point, Indiana, and developing a business park for lease and eventual sale. The members of East Point are Fieldview and another group called Investors of East Point, LLC ("IEP"). IEP owns a 70% interest in East Point and Fieldview a 30% interest. While Rusin is the sole owner of Fieldview, IEP is owned by: Michael Barrett ("Barrett), who owns a 50% interest; Sheridan Investors, LLC ("Sheridan"), which owns a 25% interest; and Lake Charles Investors, LLC ("Lake Charles"), which owns the remaining 25% interest. Sheridan is itself owned by Don and Pat Manhard, and Lake Charles by Pete and Lynn Manhard. Accordingly, Barrett owns a 35% interest in East Point, and Sheridan and Lake Charles each own a 17.5% interest.

On May 1, 2006, East Point purchased the Property from Fieldview for a purchase price of $4.9 million. The purchase was financed by loans from Private-Bank ("the Bank"), an Illinois bank based in Chicago. East Point

borrowed $2.2 million, and Fieldview borrowed $2.7 million. The loans were secured by promissory notes and mortgages on the Property. East Point's mortgage was listed as a primary mortgage, and Fieldview's mortgage was listed as a secondary mortgage. In addition, Rusin, Barrett, and the Manhards all personally guaranteed the loan to East Point.

[5] During the development of the Property, East Point received three loan renewals from the Bank, each extending the maturity date of the East Point loan. The first renewal extended the maturity date to March 15, 2009; the second renewal extended the maturity date to March 15, 2010; and the third renewal extended the maturity date to September 15, 2010.[1] This renewal process also involved two other loans involving the Manhards, and the Bank desired to keep the Manhards as clients.

[6] East Point's loan had an "interest reserve" feature that allowed East Point to borrow from the loan commitment to pay the interest due on the loan, thereby increasing the balance of the loan.[2] East Point did this to fund development

---

[1] The last of these renewals occurred after the second-extended maturity date of March 15, 2010, but the Bank nevertheless considered the loan as not being in default.

[2] The applicable provision of the loan agreement provides:

> 2.3 Use of Loan Proceeds. Borrower represents and warrants to Bank that Borrower shall use the proceeds of the Loan made pursuant to this Agreement and the Loan Documents solely as follows:
>
> (a) To acquire the Property and pay real estate taxes and insurance premiums with respect thereto;
>
> (b) To provide general and administrative costs of the Project and for obtaining this Loan, which such Loan costs shall include, without limitation, bank fees, origination fees, title fees and attorneys' fees; and

costs and to pay Fieldview's two yearly loan payments of $32,500. Although the East Point loan was not formally tied to other loans via cross-collateralization, the Bank viewed the East Point loan together with the loans to Barrett and the Manhards for purposes of determining the Bank's aggregate credit exposure.

[7] The Bank funded East Point's first draw request in 2009, and East Point used the money from this draw to make three $32,500 payments on the Fieldview loans. The Bank also funded two other draw requests, the last being a $33,000 draw to pay the March 2010 Fieldview mortgage payment, which was funded on March 15, 2010, the maturity date of the East Point loan, which was later extended to September 15, 2010, as noted above.

[8] In July 2010, the Bank and East Point discussed the loan. East Point wanted the Bank to extend the maturity date once again. The Bank proposed that $500,000 of debt from one of the other Manhard loans be transferred to the East Point loan, the reason being that the loan-to-value ratio of one of the Manhard loans was too high, whereas the loan-to-value ratio of the East Point loan was within the Bank's underwriting criteria. One of East Point's agents, Tom Sherman

---

(c) To provide a source of payment of interest on the Loan. In this regard, Borrower shall establish an "interest reserve" in the amount of Two Hundred Thousand and no/100 Dollars ($200,000.00) by reserving and segregating $200,000 of the Non- Revolving Facility for the sole purpose of the payment of interest, which interest reserve may be utilized, and drawn on, by Borrower to pay monthly interest due from Borrower to Bank pursuant to the Note.

Appellants' App. p. 336.

("Sherman"), told the Bank that shifting this debt was a problem because the East Point loan involved Barrett and Rusin in addition to the Manhards. The Bank responded that it had issues with a long-term loan renewal on the East Point loan because Barrett had an unrelated loan on property with an outstanding tax payment.

On September 8, 2010, East Point submitted another draw request to the Bank for $32,500 to pay the Fieldview loan payment. Although the loan had not yet matured, and funds were available in the loan commitment, the Bank did not fund the draw request, nor did the Bank respond to the request or provide East Point with an explanation of the failure to fund the requested draw.

On September 10, 2010, five days before the maturity date of the East Point loan, Sherman and Tom Manhard met with the Bank's loan officers. The East Point offer was modified to include payment of Barrett's outstanding property taxes. East Point's proposal also included transferring $300,000 of debt to East Point with an eighteen-month extension of the maturity date with an option for an additional eighteen-month extension. It also proposed eliminating the interest reserve and draw feature, thereby requiring East Point to make its payments from funds other than the loan itself.

East Point contends that the Bank agreed to this renewal, as evidenced by the Bank's asset report, which states: "Pape and Ahern [the Bank's agents] met with [the] Manhards on 09/10/10 and they have agreed to [the] plan above and

bank needs to formalize the proposal above." Appellants' App. p. 1350. However, the alleged renewal agreement was never reduced to writing.

[12] On November 29, 2010, the Bank made an internal report indicating that it was "scrapping" the proposed East Point loan renewal. On December 10, 2010, the Bank sent a demand letter to East Point and its guarantors, declaring that the loan was in default due to the maturation date having passed, and demanded payment of the balance of the loan within ten days. The Bank subsequently presented a pre-negotiation agreement to East Point and its guarantors, which contained a provision stating, "Borrower acknowledges and agrees that Lender is not in default under any of Lender's obligations contained in the Loan Documents," and "Borrower acknowledges and agrees that Lender has . . . performed all of Lender's obligations and agreements . . . that all actions taken to date by Lender . . . have been reasonable . . . in good faith, and within lender's rights under the loan documents and applicable law." Appellants' App. pp. 1216, 1218. East Point and its guarantors refused to sign this agreement and sent a revised version of the agreement to the Bank. The Bank never signed the revised agreement and filed suit against East Point and its guarantors on February 15, 2011.

[13] After filing suit, the Bank made a joint forbearance proposal to East Point and two of the other Manhard loans. The Bank's proposal called for cross-defaults among the three loans and their guarantors, and called for Fieldview to assign its mortgage to the Bank as security for Rusin's guarantee of the East Point loan. The borrowers rejected the Bank's proposals.

The Bank subsequently settled with the Manhards and Barrett under agreements that provided that the Manhards and Barrett would pay $350,000 to settle their liability with the Bank as guarantors of the East Point loan. One provision of the settlement agreements provided that the Manhards and Barrett, or any entity they controlled:

> Shall not, directly or indirectly, provide any loans, capital contributions or financial assistance to East Point, Fieldview or IEP; contest, delay, hinder, interfere with or otherwise affect the prosecution of the Foreclosure Action; provide any assistance to East Point in contesting, delaying or hindering the Foreclosure Action; consent to, approve or acquiesce in any amendment to the Operating Agreement of East Point or IEP which is in any manner adverse to the Bank; and sell, assign, transfer, encumber or consent to any transfer of any interest in East Point or IEP.

Appellants' App. pp. 1223, 1362, 1371. After signing the settlement agreements, Barrett and the Manhards notified Rusin that they were resigning their management roles at East Point. On September 26, 2011, the Bank dismissed Barrett and the Manhards from the suit. The remaining defendants were East Point, Fieldview, and Rusin. Since Rusin was the sole owner of Fieldview, and Fieldview the only non-settling owner of East Point, the remaining defendant is effectively Rusin. Fieldview filed a counterclaim on May 18, 2011, alleging tortious interference with the contract and inducement of breach of contract, breach of contract, and abuse of process. Fieldview also sought to foreclose on its secondary mortgage on the Property.

[15]     On September 27, 2012, the Bank sold the East Point loan to PREH, who was substituted as the plaintiff. On July 20, 2013, PREH filed a motion for summary judgment. The trial court granted the Defendants several extensions of time to file a reply to PREH's motion for summary judgment. The last of the trial court's orders on the subject provided that "Defendants' Response to the Motion for Summary Judgment shall be due three (3) days after the conclusion of the deposition of Private Bank and Trust, Co., unless otherwise agreed by the Parties or Ordered by the Court." Appellants' App. pp. 636-37. The Defendants' counsel then filed a Notice to the Court of Agreed Briefing Schedule on Motion for Summary Judgment. *Id.* at 641. In this notice, the Defendants stated that the parties had agreed that the Defendants' answer brief to the motion for summary judgment would be due on August 22, 2014, and that PREH's reply would be due on August 29, 2014.

[16]     On August 22, 2014, the Defendants filed a joint brief responding to PREH's motion for summary judgment. However, the brief was not accompanied by any affidavits or other designated evidence. Instead, the Defendants did not file their designated evidence until December 24, 2014. The Defendants also filed a motion to strike the affidavit of PREH's principal Arshad Malik ("Malik") as being contrary to his subsequent deposition testimony. PREH filed a reply brief on August 29, 2014, in accordance to the timeline set forth in the agreed briefing schedule. Accompanying PREH's reply was a motion to strike the Defendants' exhibits.

The trial court held a summary judgment hearing on September 3, 2014. At the conclusion of the hearing, the trial court took the matter under advisement and requested that the parties submit proposed findings and conclusions, which the parties subsequently did. On October 24, 2014, counsel for Fieldview and Rusin filed a Declaration of Technical Difficulty and Delay in filing Summary Judgment Motion Evidence. On November 20, 2014, the trial court granted PREH's motion for summary judgment and entered a decree of foreclosure. The Defendants now appeal.

## Summary Judgment Standard of Review

Our standard for reviewing a trial court's order granting a motion for summary judgment is well settled:

> A trial court should grant a motion for summary judgment only when the evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The trial court's grant of a motion for summary judgment comes to us cloaked with a presumption of validity. An appellate court reviewing a trial court summary judgment ruling likewise construes all facts and reasonable inferences in favor of the non-moving party and determines whether the moving party has shown from the designated evidentiary matter that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. But a de novo standard of review applies where the dispute is one of law rather than fact. We examine only those materials designated to the trial court on the motion for summary judgment. Our standard of review is not altered by the fact that the parties filed cross motions for summary judgment. Here, the trial court made findings of fact and conclusions of law in support of its entry of summary judgment. Although we are not

bound by the trial court's findings and conclusions, they aid our review by providing reasons for the trial court's decision. We must affirm the trial court's entry of summary judgment if it can be sustained on any theory or basis in the record.

*Altevogt v. Brand*, 963 N.E.2d 1146, 1150 (Ind. Ct. App. 2012) (citations and internal quotations omitted).

## I. Did the Defendants Timely File Designated Evidence?

[19] Before addressing the merits of the Defendants' arguments, we turn first to PREH's claim that the trial court should not have considered any of the Defendants' designated evidence because the evidence was not timely filed. PREH claims that the Defendants' response to its motion for summary judgment was due no later than May 30, 2014, which was the date listed in the trial court's order entered on April 25, 2014, in which the court accepted the parties' agreed motion to alter the due date of the Defendants' response to summary judgment. PREH argues that this was the last extension of time requested by the Defendants.

[20] Our review of the record, however, reveals that the trial court entered several subsequent orders extending the date on which the Defendants' response to PREH's motion for summary judgment was due. Specifically, after PREH moved to continue the summary judgment hearing, on May 21, 2014, the Defendants filed an agreed motion requesting that the Defendants' summary judgment response(s) be due no later than June 30, 2014. The trial court granted

this motion two days later, giving the Defendants until June 30, 2014, to file their materials in response to PREH's summary judgment motion.

[21] Then again, on June 26, 2014, the Defendants filed another agreed motion, with the consent of opposing counsel, requesting that the trial court "alter the summary judgment motion response date to July 17, 2014[.]" Appellants' App. p. 627. The trial court granted this motion the following day, ordering that: "The time for Defendants' response to the summary judgment motion filed by Private Real Estate Holdings LLC ("PREH') is changed to July 17, 2014[.]" *Id.* at 629-30.

[22] Then, on July 16, 2014, the Defendants filed yet another agreed motion seeking to extend the deadline for filing their response to PREH's motion for summary judgment, this time to July 23, 2014. The trial court granted this motion to following day, ordering: "the time for Defendants' response to the summary judgment motion filed by [PREH] is changed to July 23, 2014[.]" *Id.* at 634.

[23] That same day, July 17, 2014, however, the trial court issued an Agreed Order on Emergency Motion for Trial Rule 26(C)(2) Protective Order, which provided in relevant part:

> IT IS ORDERED THAT the 30(b)(6) deposition of Third Party Defendant, PrivateBank and Trust Co. shall not last longer than seven (7) hours on any one day. Should the Defendant, Fieldview Properties, LLC and Karen Rusin need additional time to take the deposition of PrivateBank and Trust Co., then the parties will agree to continue the deposition at the next earliest date available to all parties. Furthermore, the parties agree that

should the deposition of PrivateBank and Trust Co., need to proceed onto a second day, then Defendants Response to the Motion for Summary Judgment shall be due three (3) days after the conclusion of the deposition of PrivateBank and Trust Co., *unless otherwise agreed by the Parties or Ordered by the Court*.

*Id*. at 636-37 (emphasis added).

On August 18, 2014, the Defendants filed a Notice to the Court of Agreed Briefing Schedule on Motion for Summary Judgment, which stated:

> The parties, by and through the undersigned, David J. Tipton, counsel for Defendants Fieldview Properties, LLC and Karen Rusin, hereby notify the Court that counsel for all parties have agreed on a briefing schedule concerning the pending summary judgment motion filed by the substitute plaintiff [PREH] now scheduled for hearing on September 3, 2014 at 1:00 p.m., as follows:
>
> -Defendants' answer brief due date: Friday, August 22, 2014;
>
> -[PREH] reply brief due date: Friday, August 29, 2014.
>
> The parties have engaged in at least seven (7) different days of depositions over the last two (2) months in connection with the summary judgment motion and this case. Unless the Court disagrees and orders a different briefing schedule, the parties respectfully request that the Court accept this agreed briefing schedule as if ordered by the Court.

Appellants' App. pp. 641-42. Based upon our review of the record, however, it appears that the trial court never entered an order formally accepting this briefing schedule. Still, the trial court's previous order of July 17 allowed the parties to alter the deadline by agreement of the parties *or* as ordered by the court.

Accordingly, the Defendants filed their brief in response to PREH's motion for summary judgment on August 22, 2014, as set forth in the agreed motion. As noted above, however, they did not file their designated evidence until August 24, 2014, two days past the deadline. Thus, even granting the Defendants the grace of an extended August 22 deadline, they did not file their designated evidence in time.

At the September 3, 2014, summary judgment hearing, counsel for the Defendants explained the delay by claiming that he had experienced technical difficulties with the Lake County e-filing system that prevented him from filing the designated materials with the court on August 22. PREH responded by informing the court that, if the Defendants' counsel did have technical difficulty with the e-filing system, then he was required to have filed a notice of manual filing or declaration pursuant to local court rules. The rule at issue provides in relevant part:

> E. Conventional Filing of Documents. A conventionally filed document is one presented to the clerk or to a party in paper or other non-electronic, tangible format. Unless specifically authorized by the court, only the following documents may be filed conventionally and not electronically:
>
> > (1) *Exhibits and Other Documents That Cannot Be Converted to a Legible Electronic Form, Such as Videotapes, X-Rays, and Similar Materials.* Whenever possible, the filer is responsible for converting filings to an electronic form. **If electronic filing is not possible, the filer shall electronically file a Notice of Manual Filing as a notation to be placed on the CCS that filings are being held in the clerk's office in paper. The filer shall serve**

> **the Notice of Manual Filing and the documents in accordance with the Indiana Rules of Civil Procedure and applicable Local Rule(s); and shall file a certificate of service.** A Notice of Manual Filing form is appended hereto as Form 2; a Certificate of Service form is appended hereto as Form 3.
>
> * * *
>
> J. Technical Failures. If a registered user is unable to file a document in a timely manner due to technical difficulties in the LCOD [Lake County Online Docket], **the registered user must file a document with the court as soon as possible notifying the court of the inability to file the document.** A sample document titled Declaration that Party was Unable to File in a Timely Manner Due to Technical Difficulties is attached hereto as Form 4. **Delayed filings shall be rejected unless accompanied by the declaration attesting to the filer's failed attempts to file electronically at least two times, separated by at least one hour, after noon on each day of delay due to such technical failure.**

Lake County Rule of Civil Procedure 17(E)(1), (J) (bold emphasis added).

[27] Still, it was not until October 24, 2014, over two months after the belated e-filing, that counsel for Fieldview and Rusin filed a Declaration of Technical Difficulty and Delay in filing Summary Judgment Motion Evidence. In this motion, counsel asserted:

> On the due date for the opposing papers to the summary judgment motion filed by PRE[H], August 22, 2014, in the evening, I filed the joint brief of Defendants opposing the summary judgment motion, Defendants' designation of Evidence and the Affidavit of Karen Rusin. At approximately 10:00 p.m. Eastern Time, I began attempting to upload the Designated

Evidence consisting of deposition transcripts and exhibits. The format was pdf, but it was in a bundled format (as received from the court reporter). After numerous tries to upload these pdf documents, ending at approximately 11:00 p.m. Eastern Time, it was apparent to me that uploading the Designated Evidence in their current format was not working and would not work. I came back over the weekend and unbundled the transcripts and exhibits and was successful in uploading all of the Designated Evidence. All of these events occurred outside of regular business hours and it was not possible to substitute the filing manually or ask for help from the clerk's office.

I informed the Court and opposing counsel of these events in open Court at the September 3, 2014 hearing on the summary judgment motion. I do not believe that any party was prejudiced because the attorney for PRE[H] was already in receipt of the Designated Evidence (they had copies of all deposition transcripts and exhibits before August 22, 2014), and all citations to the Designated Evidence in the brief was accessible from those materials by the attorneys for PRE[H] in preparation of their reply brief. The occasioned delay was a portion of the weekend only.

Appellants' App. p. 1492.

[28] We have no reason to doubt that the Defendants' counsel experienced technical difficulty with the e-filing system, and we sympathize with counsel in such a situation. Indeed, as e-filing is implemented throughout Indiana, we expect that in some rare instances, technical issues might prevent or delay an electronic filing. Indeed, Trial Rule 86 contemplates and provides for such occurrences, with the expectation that an appropriate and timely record will be made of the difficulties encountered, so that courts can consider and rule on the effect of

such difficulties. In similar fashion, we now look to the clear language of the Local Rule 16, which clearly anticipates such situations and sets forth the steps to follow in the case of such technical difficulties.

[29] Pursuant to the applicable rule, counsel was required to file with the trial court *as soon as possible* a document notifying the court of his inability to electronically file the document. Here, counsel simply informed the trial court of the difficulties at the summary judgment hearing and did not file any such notification with the court until *sixty-one* days after the date the designated materials were due. We cannot say this constitutes "as soon as possible," nor did counsel's notification to the court indicate that he unsuccessfully attempted to file electronically at least two times, separated by at least one hour, after noon on each day of the delay, as required by the rule. In absence of compliance with the provisions of this rule, the trial court was required to reject the delayed filings. *See* Lake County Rule of Civil Proc. 16(J).

[30] Because the Defendants' designated materials were untimely filed, the trial court could not consider them. Indiana Trial Rule 56(C) provides that a party opposing a summary judgment motion has thirty days after service of the motion to serve a response and any opposing affidavits. "For cause found," a trial court is authorized to "alter any time limit set forth in this rule upon motion made within the applicable time limit." Ind. Trial Rule 56(1). Our supreme court has described this as a "bright line rule" and explained:

> [W]here a nonmoving party fails to respond within thirty days by either (1) filing affidavits showing issues of material fact, (2) filing

his own affidavit under Rule 56(F) indicating why the facts necessary to justify his opposition are unavailable, or (3) requesting an extension of time in which to file his response under 56(1), the trial court lacks discretion to permit the party to thereafter file a response. *In other words, a trial court may exercise discretion and alter time limits under 56(1) only if the nonmoving party has responded or sought an extension of time within thirty days from the date the moving party filed for summary judgment.*

*HomEq Servicing Corp. v. Baker,* 883 N.E.2d 95, 98 (Ind. 2008) (emphasis added); *accord Handy v. P.C. Bldg. Materials, Inc.*, 22 N.E.3d 603, 606-07 (Ind. Ct. App. 2014), *trans. denied.*

[31] This rule applies to materials filed belatedly after an extension of time has already been granted by the trial court. That is, "not only must a nonmovant file a response or request for a continuance during the initial thirty-day period, but the nonmovant 'must also file a response, file an affidavit pursuant to T.R. 56(F), or show cause for alteration of time pursuant to T.R. 56(I) during any additional period granted by the trial court.'" *Miller v. Yedlowski*, 916 N.E.2d 246, 251 (Ind. Ct. App. 2009) (citing *Thayer v. Gohil*, 740 N.E.2d 1266, 1269 (Ind. Ct. App. 2001)). The reason for this rule was explained in *Miller:*

> The rationale behind the rule requiring a nonmoving party to respond to a motion for summary judgment—by either filing a response, requesting a continuance under Trial Rule 56(I), or filing an affidavit under Trial Rule 56(F)—within thirty days does not vanish because the trial court has happened to grant one extension of time. *That is, the nonmoving party should not be rewarded and relieved from the restriction of responding within the time limit set by the court because he or she has had the good fortune of one enlargement of time.* Therefore, any response, including a

subsequent motion for enlargement of time, *must* be made within the additional period granted by the trial court. The rationale of *HomEq* and the cases leading up to it are not restricted to the initial thirty-day period following the filing of a motion for summary judgment.

*Miller*, 916 N.E.2d at 251-52 (emphasis added).

[32] Accordingly, once the already-extended deadline had passed, the trial court had no discretion to further extend it, and the designated materials submitted by the Defendants should not have been considered. Likewise, we will not consider these belatedly filed materials on appeal.

## II. Should the Trial Court Have Stricken Certain Affidavits?

[33] The Defendants first argue that the trial court should have stricken the affidavit of PREH's principal Malik. They claim that the affidavit conflicts with Malik's subsequent deposition testimony. To be sure, Indiana courts have long held that a party who has been examined at length during a deposition cannot create a genuine issue of material fact simply by submitting an affidavit contradicting his own prior testimony. *Brown v. Buchmeier*, 994 N.E.2d 291, 296 (Ind. Ct. App. 2013) (citing *Gaboury v. Ireland Rd. Grace Brethren, Inc.*, 446 N.E.2d 1310, 1314 (Ind. 1983)). Otherwise, the utility of summary judgment would be greatly diminished as a procedure for screening out sham issues of fact. *Id.*

[34] Here, Malik submitted an affidavit in which he averred that he kept the books and records of PREH and that these books and records were kept in the ordinary course of PREH's business. Appellants' App. p. 505. In his subsequent

deposition testimony, however, Malik testified that he had never actually seen the documents related to PREH and East Point, that he did not look at the documents before signing his affidavit, and that his attorney actually kept the loan records. *Id.* at 651-54. Accordingly, Malik did not submit an affidavit contrary to his *prior* deposition testimony. Instead, his subsequent deposition testimony was inconsistent with his earlier affidavit. This does not suggest that Malik was attempting to manufacture a sham issue of fact. Instead, it appears that the Defendants' counsel was simply able to effectively examine Malik at the deposition and impeach his affidavit. Under these circumstances, the trial court did not abuse its discretion by denying the motion to strike Malik's affidavit.

[35] The Defendants also complain that the affidavit submitted by Bank manager Christopher Leff ("Leff") contained improper conclusory statements that should have been disregarded. Specifically, they refer to Paragraph 16 of Leff's affidavit, in which he avers that "[The Bank] (as predecessor in interest) has performed all conditions precedent to Plaintiff's rights to enforce the agreements with East Point under the Loan Documents." Appellants' App. p. 501.

[36] As explained in *Gast v. Hall*:

> Indiana Trial Rule 56(E) provides, in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Discussing that rule, our Supreme

> Court has stated, "Conclusory statements not admissible at trial
> should be disregarded when determining whether to grant or
> deny a summary judgment motion."

858 N.E.2d 154, 162 (Ind. Ct. App. 2006) (quoting *Paramo v. Edwards*, 563
N.E.2d 595, 600 (Ind. 1990)).

[37] The statement in Leff's affidavit that the Bank had performed all conditions precedent to enforce the note and mortgage was, by itself, conclusory. However, other evidence designated by PREH, including the loan documentation itself, established that the Bank met the conditions for it to enforce the note and mortgage: an event of default occurred when the loan was not renewed, a demand letter was sent, ten days transpired, and the loan was not repaid. The Defendants refer us to nothing else that would be required for the Bank or PREH, as the Bank's successor in interest, to enforce the note and mortgage.[3] Thus, even without the conclusory language of the second Malik affidavit, there was sufficient designated evidence to establish that the Bank and PREH had met the conditions precedent to enforcing the note and mortgage.

[38] In short, we find nothing improper in the trial court's failure to strike Malik's affidavit or in its consideration of the evidence designated by PREH.

---

[3] The Defendants also briefly claim, in a two-sentence argument, that the second affidavit from Malik, in which he averred that PREH had incurred $125,000 in attorney fees, is insufficient to support an award of attorney fees, citing *U. S. Aircraft Fin., Inc. v. Jankovich*, 407 N.E.2d 287, 295 (Ind. Ct. App. 1980). However, this argument is not further developed, and we therefore consider it waived. *See* Ind. Appellate Rule 48(a)(8)(A); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002).

## III. Did the Parties Agree to a Fourth Loan Renewal?

[39] The core of the Defendants' argument is that evidence indicated the Defendants and the Bank came to an oral agreement to renew the loan for a fourth time but that the Bank subsequently reneged on its agreement. Thus, the Defendants argue, the Bank is a breaching party who may not now seek to enforce the loan agreements.

[40] The Defendants contend that on September 10, 2015—five days before the loan matured—East Point and the Bank agreed to a three-year renewal and were simply waiting for the Bank to prepare the renewal documentation. The Defendants admit that, at first blush, this argument appears to be doomed by operation of the statute of frauds found in the Indiana Lender Liability Act ("ILLA"). *See* Ind. Code § 26-2-9-4. The Defendants claim, however, that their counterclaim does not fall within the purview of this section. Specifically, the Defendants argue that, pursuant to the version of the ILLA statute of frauds in effect at the time the loan agreement was executed did not apply to counterclaims by debtors. *See Sees v. Bank One, Ind., N.A.*, 839 N.E.2d 154, 159 (Ind. 2005).

[41] PREH argues that the Defendants' counterclaim is governed instead by Illinois law. PREH notes that loan agreement contained a choice-of-law provision providing:

> This Agreement and the Loan Documents shall be governed and
> controlled by the laws of the State of Illinois as to interpretation,
> enforcement, validity, construction, effect, choice of law and in
> all other respects, including, but not limited to, the legality of the

interest rate and other charges, but excluding priority and perfection of any liens granted to Bank on the Property, and the foreclosure thereof, all of which shall be governed and controlled by the laws of the relevant jurisdiction.

Appellants' App. p. 355.

[42] The Defendants admit that, under Illinois law, their allegation of an oral agreement to extend the loan maturity date would fail, as Illinois courts have long interpreted the applicable Illinois statute of frauds to bar defenses as well as counterclaims. *See Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 225 (7th Cir. 1996) (noting that Illinois courts have interpreted the statute of frauds contained in the Illinois Credit Agreement Act to proscribe all actions which depend for their existence upon an oral credit agreement) (citing *Klem v. First Nat'l Bank of Chicago*, 655 N.E.2d 1211, 1213 (Ill. App. Ct. 1995)).

[43] The Defendants argue, however, that Illinois law should not apply, insisting that the statute of frauds is merely procedural in nature. The Defendants note:

> A contract provision that an agreement is to be governed by the law of another state operates only as to the substantive law of that state, and the procedural law of the forum state applies to procedural issues. Laws that merely prescribe the manner in which individual rights and responsibilities may be exercised and enforced in a court are procedural.

*Simon Prop. Grp., L.P. v. Acton Enterprises, Inc.*, 827 N.E.2d 1235, 1237 (Ind. Ct. App. 2005) (citing *Ind. CPA Society v. GoMembers, Inc.*, 777 N.E.2d 747, 749-50 (Ind. Ct. App. 2002)).

The question, therefore, becomes whether the statute of frauds is a substantive or procedural law. If it is procedural, then Indiana law applies, and their claim of an oral loan renewal might survive. If it is substantive, then Illinois law applies, and their claim of an oral renewal is barred.

Jurisdictions appear to be split on this issue. *See* Comment note—Statute of Frauds and Conflict of Laws, 47 A.L.R.3d 137 §2[a]. However, Indiana courts have long held that a statute of frauds is a substantive law. *See id.* at 5[b] (citing *Henning v. Hill*, 80 Ind. App. 363, 141 N.E. 66 (1923); *Cochran v. Ward*, 5 Ind. App. 89, 29 N.E. 795 (1892)). Indeed, in *Cochran*, the court held that the Illinois statute of frauds "became part of the agreement in suit, and the provision [in the statute of frauds] that no action should be maintained for damages for the breach of the agreement became as much a part of its character and substance as if specifically incorporated therein." *Cochran*, 29 N.E. at 797.

We agree with the court in *Cochran* and hold that the Illinois statute of frauds is substantive and not merely procedural. Because it is substantive, the Illinois statute controls.[4] Under Illinois law, the Defendants' defense of an oral

---

[4] Even if Indiana law applied, it is not clear that the Defendants' claim of an oral agreement would be viable. As amended effective July 1, 2006, the ILLA statue of frauds bars claims based on verbal agreements regardless of whether they are brought by a creditor or a debtor. Thus, the current ILLA statute of frauds would bar the Defendants' claim that the Bank made an oral agreement in September 2015 to further extend the loan maturity date.

Still, the Defendants contend that, because the original promissory note was executed on May 1, 2006, we should apply the then-existing version of the ILLA statute of frauds, which was held not to apply to a *debtor's* assertion of an affirmative defense based on an alleged oral representation by the creditor. *See Sees,* 839 N.E.2d at 159. The only authority cited by the Defendants in support of their position is *Paulson v. Centier Bank*, 704 N.E.2d 482 (Ind. Ct. App. 1998). However, in that case, the court held that a creditor's counterclaim based on an alleged oral agreement was not barred by the ILLA statute of frauds because the

agreement to renew the loan is barred.  Accordingly, the Defendants' claim that the loan maturity date was extended by an oral agreement fails.[5]

## IV.  Did the Bank Breach the Contract?

[47]    The Defendants also claim that it was the Bank who breached the loan agreement first by failing to honor the verbal loan renewal agreement. Because the Defendants' claim of a verbal renewal of the loan agreement is barred by the applicable statute of frauds, their claim that the Bank was the initially breaching party for failing to honor the terms of the alleged renewal necessarily fails.

[48]    Still, the Defendants argue that the Bank breached the terms of the loan agreement when it failed to fund a draw requested by East Point. Specifically, the Defendants claim that, two days before the stated maturity date, the Bank failed to honor East Point's fourth draw request in the amount of $32,500, which was required to make a mortgage payment to Fieldview. Section 2.3(a) of the loan agreement provides that East Point was allowed to use loan proceeds to "acquire the Property." Appellants' App. p. 336; *see also* note 2,

---

note was dated prior to the effective date of the ILLA. *See id.* at 491; *see also* Ind. Code § 26-2-9-0.2 (providing that the ILLA "does not apply to credit agreements entered into before July 1, 1989.").

In contrast, here, the promissory note was executed on May 1, 2006, well after the effective date of the ILLA. Also, the alleged oral agreement was entered into well after the effective date of the current version of the ILLA statute of frauds barring a defense based on an alleged oral agreement.

[5]  The Defendants also briefly claim, without citation to authority, that their claim of a verbal extension of the maturity date, as a defense to the foreclosure action, should be governed by Indiana law because the foreclosure is governed by Indiana law.  This claim, however, is not fully developed, and we therefore will not consider it on appeal.  *See* Ind. Appellate Rule 48(a)(8)(A); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002).

*supra*. The Bank honored previous draw requests, and acknowledged that the draws were not improper. Thus, the Defendants claim, the Bank breached the loan agreement by failing to honor and fund the fourth draw request. We disagree.

[49] Section 2.3(a) of the loan agreement permitted East Point to "acquire" the Property with the loan proceeds. *Id*. However, by the time of the fourth draw request, East Point had already acquired the Property. Although the other draw requests were used to pay the mortgage payments on the second mortgage held by Fieldview, the Defendants refer us to nothing in the loan agreement that would *require* the Bank to fund the draw requests so that East Point could make a payment on the Fieldview mortgage. Instead, the plain language of the loan agreement seems to contemplate the interest reserve to be used only to pay the interest on the loan. *Id.*

[50] We therefore cannot say that the Defendants have demonstrated the existence of a genuine issue of material fact with regard to whether the Bank breached the loan agreement.[6]

---

[6] To the extent that the Defendants claim that the Bank's prior approval of the draw requests established a course of dealings that was violated when the Bank refused to fund the fourth draw request, such claim is waived for failure to make fully-developed, cogent argument. *See* App. Rule 48(a)(8)(A); *Loomis*, 764 N.E.2d at 668. Furthermore, we agree with PREH that this argument would contravene the Subordination Agreement signed by the parties. Paragraph 18 of the Subordination Agreement provides that "no course of dealings between the parties, no usage of trade and no parole [sic] or extrinsic evidence of any nature shall be used to supplement or modify any of the terms of provisions of this Agreement." Appellants' App. p. 518.

## V. Is the Foreclosure Action Barred by the Bank's Unclean Hands?

Lastly, the Defendants claim that PREH, as the successor in interest to the Bank, should not be able to foreclose on the mortgage because of the Bank's allegedly unclean hands. Foreclosure actions are equitable in nature, and trial courts have full discretion to fashion equitable remedies that are complete and fair to all parties involved. *City Sav. Bank v. Eby Const., LLC*, 954 N.E.2d 459, 464 (Ind. Ct. App. 2011). The equitable doctrine of "unclean hands" provides that the party who seeks equitable relief must be free of wrongdoing in the matter before the court. *Id.* at 465.

The Defendants argue that the Bank was not free of wrongdoing in its dealings with East Point. The Defendants point to the Bank's behavior when negotiating with East Point to renew the loan, specifically: the Bank's desire to group the East Point loan with the other Manhard loans; the Bank's proposal to transfer $500,000 of the debt from one of the Manhard loans to the East Point loan; and the Bank's request that Barrett, one of the guarantors of the East Point loan, pay delinquent real estate taxes on another parcel he owned.

We fail to see how any of these actions constitute unclean hands. East Point was attempting to negotiate a long-term loan renewal with the Bank. In exchange, the Bank was attempting to obtain certain concessions from East Point and its guarantors. We do not view this as evidence of unclean hands; it was simply part of the negotiation process in the renewal of a multi-million-dollar loan among sophisticated parties.

[54] The same is true of the Bank's decision to "scrap" the loan renewal process and seek its legal remedies under the loan agreement. The Defendants refer us to nothing that would suggest that the Bank was obligated to renew the loan. To the extent that the Defendants claim that the Bank came to a verbal agreement to renew the loan only to later renege on the agreement, we have rejected this argument above. We will not say that the Bank acted improperly by not renewing a loan it was under no obligation to renew.

[55] We also cannot agree with the Defendants that the Bank's settlement with the Manhards and Barrett constitutes abuse of process. An action for abuse of process requires a finding of misuse or misapplication of process for an end other than that which it was designed to accomplish. *Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1029 (Ind. Ct. App. 2005) (citing *Nat'l City Bank, Ind. v. Shortridge*, 689 N.E.2d 1248, 1252 (Ind. 1997)). An action for abuse of process has two elements: (1) ulterior purpose or motives, and (2) a willful act in the use of process not proper in the regular conduct of the proceeding. *Id*. (citing *Town of Orland v. Nat'l Fire & Cas. Co.*, 726 N.E.2d 364, 371 (Ind. Ct. App. 2000)). However, if a party's acts are procedurally and substantively proper under the circumstances, then that party's intent is irrelevant. *Id*. (citing *Reichhart v. City of New Haven*, 674 N.E.2d 27, 31 (Ind. Ct. App. 1996)). A party may not be held liable for abuse of process if the legal process has been used to accomplish an outcome which the process was designed to accomplish. *Id*.; *see also Cent. Nat'l Bank of Greencastle v. Shoup*, 501 N.E.2d 1090, 1095 (Ind. Ct. App. 1986) ("[a] regular and legitimate use of process, though with an ulterior motive or bad

intention is not a malicious abuse of process") (quoting *Brown v. Robertson*, 120 Ind. App. 434, 92 N.E.2d 856, 858 (Ind. Ct. App. 1950)).

[56] Here, the Bank filed suit to collect on a loan that had matured and on which East Point had defaulted. The Defendants make no argument that East Point does not owe the money it borrowed. The Bank simply sought to foreclose on the mortgage to secure repayment of the loan balance. This was a legitimate use of process. Accordingly, any ulterior motive is irrelevant. *See id.* (citing *Reichhart*, 674 N.E.2d at 31).[7]

[57] We similarly reject the Defendants' claims that the Bank intentionally induced the Manhards and Barrett to withhold documents and information from the Defendants through coercion. First, the only act referenced is the Bank's take-it-or-leave-it settlement offer, which we consider as an end to negotiations, rather than "coercion." Moreover, the Defendants do not precisely explain which documents and information the Bank induced the Manhards and Barrett to withhold, but this appears to be a reference to the portion of the settlement agreement between the Bank and the Manhards and Barrett that contained the following provision:

---

[7] Thus, the Defendants' citation to *Nat'l City Bank, Ind. v. Shortridge*, 689 N.E.2d 1248, 1253 (Ind. 1997), *supplemented* 691 N.E.2d 1210 (Ind. 1998), is unavailing. In *Shortridge*, the court held that a genuine issue of material fact existed with regard to whether the defendant's attorney abused process by filing two improper *lis pendens* notices against property to secure an interest in a pending personal injury lawsuit, despite the law being clear that *lis pendens* is not the proper avenue to secure an interest in a pending personal injury lawsuit. *Id.* at 1253. In contrast, here, the Bank's filing of the foreclosure action was the appropriate action to recover the funds owed when the loan was in default.

> Guarantor [i.e., the Manhards and Barrett] shall not, directly or indirectly, take any action or cause or permit Lake Charles, or any other entity in which Guarantor, directly or indirectly has a controlling ownership interest, to contest, delay, hinder, interfere with or otherwise affect the prosecution of the Foreclosure Action by the Lender or provide any assistance to the Borrower, directly or indirectly, in contesting, defending, delaying or otherwise hindering the prosecution of the Foreclosure Action by the Lender. *Guarantors testifying in court or in depositions or providing documents or responses to interrogatories or requests for information filed under or permitted under court rules or pursuant to a subpoena or acts required by order of court in connection with the foreclosure action or other litigation which may be filed by Fieldview or its Members, or Karen Rusin, or Borrower, or another third party shall not be considered a breach of the foregoing provisions.*

Appellants' App. p. 1363 (emphasis added). The Defendants' argument that this provision prohibited the Manhards and Barrett from providing documents during the lawsuit appears to be in direct conflict with the above-emphasized portion of the settlement agreements that clearly states participating in the discovery process and obeying court orders is not prohibited.[8]

We also cannot agree with the Defendants that the Bank tortiously interfered with East Point's corporate governance by settling with the Manhards and Barrett. The Defendants note that the settlement agreements prevented the Manhards and Barrett from hindering, delaying, or affecting the foreclosure

---

[8] The Defendants note that the trial court sanctioned the Bank for delays in discovery that resulted in delays in the Defendants' summary judgment response. However, in its order, the trial court noted that although "East Point did much more than should have been necessary to obtain the documents it requested," the trial court "d[id] not find that Private Bank has deliberately engaged in obstruction[.]" Appellants' App. p. 592.

action. The Defendants argue that this prevented East Point from seeking other means of paying off the loan, such as selling the undeveloped portions of the Property, seeking financial assistance from the Manhards and Barrett, or seeking other partners to help develop the Property. However, the Defendants fail to explain exactly how this amounts to tortious interference with the corporate governance agreements of East Point. Indeed, the Defendants do not even set forth the elements of tortious interference in their brief. Instead, the Bank simply settled with some of the East Point guarantors but not the others. Although this has obviously placed Fieldview and Rusin in a difficult position, it is a common strategy in pending litigation, and we cannot say that it amounts to tortious interference.

[59] The Defendants also argue at some length that the Bank, and PREH as its successor in interest, has as its goal not the repayment of the loan but possession of the Property so that it may sell it at a premium after the work done by East Point. The Defendants note that the Bank's own estimates put the value of the Property at $7.45 million, whereas the loan balance was only $2.96 million. They also claim that the Bank expected a recovery of $6.85 million through the mortgage foreclosure. This argument, however, seems to misunderstand the nature of a foreclosure proceeding.

[60] By proceeding with foreclosure, the Bank may have the right to sell the Property at a foreclosure sale to satisfy the balance of the loan, but this does not automatically give it the right to possess the Property, nor is any surplus kept as a windfall by the mortgagee bank. As we have explained before:

Indiana is unequivocally committed to the lien theory [of mortgage] and the mortgagee has no title to the land mortgaged. The right to possession, use and enjoyment of the mortgaged property, as well as title, remains in the mortgagor, unless otherwise specifically provided, and the mortgage is a mere security for the debt.

*Merrillville 2548, Inc. v. BMO Harris Bank N.A.*, No. 45A03-1409-MF-345, 2015 WL 3603850, at *11 (Ind. Ct. App. June 9, 2015), *reh'g denied, trans. pending* (quoting *Oldham v. Noble*, 117 Ind. App. 68, 75-76, 66 N.E.2d 614, 617 (1946)). The proceeds of a mortgage sale are distributed as provided by the relevant statute:

> The proceeds of a sale described in IC 32-29-7 or section 8 or 12(b) of this chapter must be applied in the following order:
>
> (1) Expenses of the offer and sale, including expenses incurred under IC 32-29-7-4 or section 9 of this chapter (or IC 34-1-53-6.5 or IC 32-15-6-6.5 before their repeal).
>
> (2) The payment of the principal due, interest, and costs not described in subdivision (1).
>
> (3) The residue secured by the mortgage and not due.
>
> (4) If the residue referred to in subdivision (3) does not bear interest, a deduction must be made by discounting the legal interest.
>
> In all cases in which the proceeds of sale exceed the amounts described in subdivisions (1) through (4), *the surplus must be paid to the clerk of the court to be transferred, as the court directs, to the mortgage debtor, mortgage debtor's heirs, or other persons assigned by the mortgage debtor*.

Ind. Code § 32-30-10-14 (emphasis added). Subsequent liens on the property sold share in the proceeds of the sale only after the mortgage and other prior liens adjudged have been satisfied. *See* 20 Ind. Law Encyc. Mortgages § 175 (2015).[9]

[61] We also reject the Defendants' claims that the Bank "highjacked" East Point's right to alienate the Property by settling with the Manhards and Barrett. The Bank simply settled with some, but not all, of the guarantors. We fail to see how this can be considered inequitable or tortious conduct.

## Conclusion

[62] In conclusion, we hold that the Defendants filed their designated evidence in an untimely fashion and that such evidence should therefore not be considered. We also hold that the trial court did not err in denying the Defendants' motion to strike the affidavit of Arshad Malik, which was submitted by PREH in support of its motion for summary judgment. The Defendants' argument that the Bank made an oral agreement to a fourth loan renewal is barred by the relevant Illinois statute of frauds, which, as a substantive law, is applicable to the interpretation of the loan agreements. We also conclude that the Bank did not breach the loan agreements by reneging on the alleged oral agreement or by failing to fund the last draw request by the Defendants. Lastly, the foreclosure action is not prevented by the Bank or PREH's allegedly unclean hands.

---

[9] As the issue is not before us, we express no opinion with regard to the rights to the surplus, if any, that results from the mortgage foreclosure sale of the Property.

Accordingly, we affirm the order of the trial court granting summary judgment in favor of PREH.

[63] Affirmed.

Baker, J., and Bailey, J., concur.